**SKINNER MFG. CO. v. GENERAL FOODS SALES CO., Inc.**

**SAME v. KELLOGG SALES CO.**

Civil Actions Nos. 345, 361.

District Court, D. Nebraska,
Omaha Division.

Sept. 30, 1943.

William Ritchie, M. J. Flannigan, and Edward F. Fogarty (Ritchie & Swenson), all of Omaha, Neb., and C. Earl Hovey, of Kansas City, Mo., for plaintiff in both cases.

Edgar M. Morsman, Jr., and Edgar M. Morsman, III (Morsman & Maxwell), all of Omaha, Neb., and Clifton Cooper, of New York City, for defendant General Foods Sales Co.

George L. DeLacy (Kennedy, Holland, DeLacy & Svoboda), of Omaha, Neb., Matthias Concannon and Lee J. Gary, both of Chicago, Ill., and Edwin L. Harding, of Battle Creek, Mich., for defendant Kellogg Sales Co.

DELEHANT, District Judge.

A single memorandum is being filed in these two cases. That course seems to be appropriate.

The court has no thought that the cases are identical either in their facts or in their issues. Although the same plaintiff seeks in both cases injunctive relief for the protection of the same asserted property right, it seeks that relief against distinct and separate defendants, who, besides being competitors of the plaintiff, are competitors of each other. It is also true that the precise competitive technique of the two defendants is clearly distinguishable. Moreover, as will presently appear, the issues by which the defendants severally seek to defeat the plaintiff's quest for relief are more numerous in one case than in the other.

Yet the cases admittedly have much in common. They were not tried as a single case, but during the trial of each case, counsel for the defendant in the other case remained in the court room as observers and not always as passive observers, and virtually all of the evidence submitted in the case first tried was introduced by stipulations in the course of the trial of the later one. Then, of necessity, the facts touching the plaintiff's production and marketing of its own product and the history of the breakfast cereal business in general are common to both cases and are established largely by the same or similar evidence. Factually, the cases differ chiefly in the separate activities of the two defendants in the production and marketing of their respective products. Finally, the conclusion which the court has reached and the grounds upon which it is based apply with identical consequences to both cases.

So, the court is satisfied that one memorandum should not only suffice in this instance but even be more in order than the unnecessary repetition, in separate statements, of facts and legal considerations common to both cases. In each case, comprehensive findings of fact, conclusions of law, and a judgment are being filed, which are wholly divorced from those of the companion case. No attempt will be made here to restate the facts of the cases in detail and with appropriate distinctions. The court will merely set out some of the more salient general facts, and state, without any attempt at adequacy in citation of authorities, some of the considerations which have chiefly prompted its final judgments.

The pleadings are voluminous in each case. They have been supported by thousands of pages of testimony and an almost disconcerting number of exhibits, the general instructiveness of which, however, is manifest. The court is under an acknowledged obligation to counsel for all of the parties who, with conspicuous diligence, industry and legal scholarship, have drawn to its attention virtually all of the extensive legal literature upon the subject involved, in many excellent briefs and written arguments. The authorities cited have been carefully examined by the court, although a fair appraisal of the appropriate length of a memorandum of this character forbids the citation of more than a few of them.

Basically, the relief sought in each case is the same—prevention, through injunctive process, of alleged unfair competition by the defendant against the plaintiff. The plaintiff in each case, Skinner Manufacturing Company, is a Nebraska corporation, engaged in the manufacture and sale of food products for human consumption. General Foods Sales Company, Inc., defendant in Case No. 345 (which will hereafter be referred to as "the General Foods case"), is a Delaware corporation, lawfully doing business in Nebraska, and is the wholly owned subsidiary and principal marketing instrumentality of General Foods Corporation, which is and for many years has been a major American food manufacturer, one of whose principal lines is the well known "Post's" group of cereal foods. Kellogg Sales Company, defendant in Case No. 361 (which will hereafter be referred to as "the Kellogg case"), is a Michigan corporation, lawfully doing business in Nebraska, and is the wholly owned subsidiary and principal marketing instrumentality of Kellogg Company, also a major American food manufacturer, which manufactures the Kellogg line of cereal foods, whose production was initiated by Kellogg Company's predecessors nearly forty years ago. In the general American food market, General Foods Company is the producer and marketer of a more diversified group of products than Kellogg Company, to which, however, it ranks second in the production of cereal products.

Originally, the plaintiff's business involved principally, if not always entirely, the manufacture and marketing of paste food products for human consumption with emphasis upon macaroni, spaghetti and egg noodles. In that field it achieved and now retains a prominent position. In 1925, and apparently on or shortly before June 13 of that year, it devised a food product consisting of a cereal content of flakes composed of whole wheat with added bran and a small quantity of salt, with which was mixed a quantity of California raisins. To the product the plaintiff applied the name "Raisin-Bran", which had not theretofore been employed for the identification of any breakfast cereal. The approximate proportions by weight of the finished product, were, whole wheat, 72% and added bran, 8%, with a small added amount of salt, rolled into flakes, and raisins, 20%. With only minor variations, largely in the character of wheat utilized in the manufac-

turing process, the product has remained unchanged, and its name has never been altered. From the time it was first produced, the plaintiff has continuously caused the product to be manufactured and packaged for it under successive contracts, by another Omaha, Nebraska, food manufacturer and has marketed it only in packages, never in bulk, on its own responsibility. That practice still continues.

After applying unsuccessfully in 1925 for the registration of the term, "Raisin-Bran" as a trademark under the act of February 20, 1905, as amended, Title 15 U.S.C.A. § 81 et seq., the plaintiff in 1926 applied for and procured registration under the act of March 19, 1920, Title 15 U.S.C.A. § 121 et seq.

Until the advent of the products of the defendants, the plaintiff encountered no competition in the American food market for its product known as "Raisin-Bran". No product of identical, or even similar, content (that is, a cereal base with added dried whole fruit) was marketed generally in the country, nor was the name or any approximation of it applied to any commercially marketed cereal food.

The distribution of the plaintiff's product was relatively small and narrow at first, but it grew steadily both in gross volume and in area. It has consistently been given wide advertising by various means, including, among many others, store displays, booklets in considerable variety, newspaper, bulletin and magazine publicity, publicizing games, contests, and trick devices and the like. In more recent years resort has been had to an elaborate and widely disseminated radio publicity campaign conducted principally through spot programs produced from carefully prepared script material. In all, the plaintiff's cost of advertising its product up to the trial of the Kellogg case in the summer of 1943 had exceeded $857,000, of which $118,000 was expended in 1941 and $228,000 in 1942. The sales of the plaintiff's product in dollar volume exceeded $1,500,000 in 1942, and $770,000 in the first five months of 1943. The plaintiff's operations in its "Raisin-Bran" product have been profitable to it and this result has been notably achieved during recent years.

At all times during its marketing of its product, the plaintiff has claimed to have a right to the exclusive use of the term "Raisin-Bran" in application to a com-

mercially marketed breakfast cereal and it has endeavored to promote, foster and safeguard that claim. It has consistently avoided the prefixing of its corporate name, or any variation or abbreviation thereof, to the designation "Raisin-Bran" on its packages, in its printed advertising or in its radio publicity, and has quite uniformly insisted that its product be branded and referred to simply as "Raisin-Bran". Upon its packages it has always identified itself as the origin of the product by a clearly legible, though inconspicuous, legend, somewhat similar to that presently employed, namely, "An exclusive product distributed by Skinner Manufacturing Co., Omaha, Neb.", occupying upon the package a position subordinate to the prominent designation of the product simply as "Raisin-Bran". Wholesale grocers in price sheets, and retail grocers in local advertising to the retail trade, even before the advent of the competing products, frequently though not always advertised and since the beginning of competition quite uniformly advertise the plaintiff's product as "Skinner's Raisin Bran" or "Raisin Bran, Skinner's". But this practice appears consistently to have been discouraged by the plaintiff, and to have resulted from the merchandisers' fairly general practice of connecting maker and product in advertising. On two occasions, and then briefly, publicity for the product devised by advertising agencies employed by the plaintiff associated the name "Skinner's" directly and immediately, as a qualification of the product "Raisin-Bran", but these instances serve rather to emphasize than to negative the plaintiff's claim, for on each such occasion the practice upon its discovery by the plaintiff was promptly abandoned on the plaintiff's orders.

The plaintiff's best and most profitable marketing area, prior to, and at, the onset of the competition which it assails included the southern portion of the United States westerly from the Atlantic coast to, and including, Texas and Oklahoma. That area is also the largest sales field for dry prepared breakfast cereals of a general character. However, the plaintiff's coverage is practically nation wide, though in varying intensity; and it has sold its product to some extent, at least, in all states of the country with the possible exception of New Hampshire.

In the spring of 1942 the defendant in the General Foods case, for itself and its corporate owner, announced to the grocery trade its imminent offering to the breakfast cereal trade of a cereal to be composed of bran cereal flakes and raisins and to be designated as "Post's Raisin Bran". Some of the publicity in furtherance of this announcement came to the attention of the plaintiff, which, on April 30, 1942, in writing demanded of both the defendant in question and its owner that they desist from their purpose. However, the protest was fruitless, and during the last week in April in 1942, the defendant in the General Foods case initiated the marketing of its new product accompanied by an intensive advertising and selling campaign which included a temporary combination package sale device (whereby a package of "Post's Raisin Bran" was virtually given to the purchaser of a package of another "Post's" product), printed publicity, and especially an expensive radio broadcasting program featuring a nationally celebrated radio program sponsoring the sale of "Post's Raisin Bran". This sales promotion, with the exception of the combination offer, continued uninterruptedly down to and through the trial of the General Foods case, and undoubtedly still continues, with variations. It resulted in substantial sales of Post's Raisin Bran in the area covered by the selling effort, which included generally the area in which the plaintiff, at the time of the entry into the field of General Foods Sales Company, had its most favorable and profitable distribution and did its most intensive advertising.

In somewhat similar manner and at nearly the same time the defendant in the Kellogg case announced its proposed entry into the same field. Late in 1941 and early in 1942 Kellogg sales department personnel and executives had given consideration to the advisability of producing, and making experimental marketing tests with, a packaged bran type cereal product containing added raisins. For this purpose they had compared combinations of raisins and one of Kellogg's part bran flake products known as "Pep" with Raisins and another of its part bran flake products known as "40% Bran Flakes". They concluded ultimately to manufacture and sell the combination of raisins and "40% Bran Flakes". Then, they had hesitated between different possible names for the contemplated product, and finally selected "Raisin 40% Bran Flakes", under which name Kellogg Company packaged, and Kellogg Sales Company

initiated the sale of, the new Kellogg product, after a warning notice from the plaintiff, similar to that given to the producers and sellers of "Post's Raisin Bran". Kellogg's marketing operations have differed from those of General Foods Sales Company, particularly, in this, that Kellogg's selling has been frankly experimental. With that factor in mind Kellogg Sales Company selected for a comparative practical study two fields, one in the south where the plaintiff had and has its most intensified publicity and sales volume, and the other in the central part of the country, notably Ohio, Illinois and Kentucky where the plaintiff's efforts and sales were less vigorously promoted. It then entered upon a promotional campaign in each of these selected areas. However, up to the time of the trial of its case its advertising expenditures and sales volume were both upon a scale more modest than those of General Foods Sales Company, and its efforts continued to be experimental. It proposes to intensify and extend its operations if, in its judgment, the results of the tests vindicate such action, and in any event asserts the right to remain in the field.

Both defendants, prior to their entry into the controverted field, had studied the marketing possibilities for their proposed products. For this purpose they had utilized their own sales and service forces, available·marketing data, and, in the case of General Foods, confidential survey studies. Both companies knew of the nature of the plaintiff's product, and the extent, and relative territorial density of its sales and advertising efforts.

The foregoing factual outline will be enlarged upon at various points in the following paragraphs where it is considered that specific facts are directly relevant to distinctive questions arising in the cases.

In May, 1942, the plaintiff instituted the General Foods case in the district court of Douglas county, Nebraska, whence it was brought by removal to this court. It prayed for a permanent injunction against the defendant, General Foods Sales Company, preventing it from advertising, offering for sale, or selling anywhere within the United States any food product under the designation "Raisin Bran" and from infringing and violating the plaintiff's claimed right to the exclusive enjoyment of the use of its alleged trademark "Raisin-Bran" in the distribution of food products. Essentially, the defendant in that case denied in its answers to the plaintiff's pleadings the validity of the plaintiff's claim to the right exclusively to use the term "Raisin Bran" for the designation of a food product and maintained that it had the right to proceed as it had in the premises. That case has been fully tried.

Late in July, 1942, the plaintiff instituted the Kellogg case in this court, and in its complaint prayed for an order "permanently enjoining and restraining the defendant from using the plaintiff's trade mark and label and from advertising, offering for sale, and selling anywhere within the United States of America, any cereal food product under the designation 'Raisin Bran' or under a label consisting of a pictorial illustration of a bowl filled with breakfast food containing raisins and from using the words 'Cereal *and* Fruit' or any notation similar thereto, in connection with said product, and from using the plaintiff's label or copying the same, or from in any way infringing or violating the plaintiff's right to the exclusive use and enjoyment of its trade mark as above described in the description of any of the plaintiff's cereal food products." The quoted prayer thus takes note of the Kellogg Company's alleged colorable imitation of the plaintiff's claimed trademark as distinguished from its utter appropriation. The specific items against which relief is sought have to do immediately with certain display material which appears on the Kellogg package. (Vide infra) Kellogg Sales Company also denied generally the plaintiff's claim and asserted its right to market its product in the manner it had pursued. But, in addition to those general issues which were also presented in the General Foods case, it tendered certain other defenses which will be separately considered. That case has also been fully tried.

It may be noted that the plaintiff makes no claim in either case to the right exclusively to produce and market its product or one similar thereto or imitative thereof. It concedes to each defendant the right to compete with it as to product but bases its claim upon its asserted trade name and its alleged appropriation by one defendant and approximation by the other.

The question submitted to the court which ought logically to be first in the order of consideration is whether in these cases the applicable substantive law is to be located among the statutes of Nebraska and the opinions of its Supreme Court or

to be gathered from pertinent decisions wherever found, and, particularly, those of the federal courts. The plaintiff argues, in each case, that by the language and logic of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, the law of *some state* must rule the decision here; and that the actual or alleged circumstances that the federal court considering the issue is that for the district of Nebraska; that the plaintiff is a Nebraska corporation and entitled to prosecute an action of this character, among other places, in the state or federal courts within Nebraska; and that the legal situs of the good will of the plaintiff's business and the impact on it of any damage consequent upon unfair competition with the plaintiff are in Nebraska, point to the Nebraska law for the applicable substantive rules.

The problem is interesting academically, and beyond superficial declarations can not be regarded as finally settled in all its aspects. The circumstance that jurisdiction in the instant case rests in part upon the Trade Mark Act of 1920, and not solely upon diversity of citizenship can hardly be disregarded. Still, in considering a situation arising under the Trade Mark Act of 1905, the circuit court of appeals for the seventh circuit, in Philco Corporation v. Phillips Mfg. Co., 7 Cir., 133 F.2d 663, 668, recently said: "If it were held that Congress created *no substantive rights but only procedural rights*, the Erie doctrine would require that state law govern substantive questions of trade-mark law, just as that doctrine would have required if it had been applied before the Act was passed." And it was declared in Armstrong Paint & Varnish Works v. Nu-Enamel Corporation, 305 U.S. 315, 316, 323, 324, 59 S.Ct. 191, 83 L.Ed. 195, that "The federal Trade Mark Act of 1920 does not vest any new substantive rights but it does create remedies in the federal courts for protecting the registrations." Doubt is thus cast in cases where registration, as here, is under the Act of 1920, upon the otherwise reasonable rule that, at least as to the validity of the mark for registration under the act, federal law exclusively should control.

Touching the issue of unfair competition alone, it has been asserted repeatedly in recent decisions that state law and not federal law governs. Fashion Originators' Guild v. Federal Trade Commission, 312 U.S. 457, 468, 668, 61 S.Ct. 703, 85 L.Ed.

949; Pecheur Lozenge Co. v. National Candy Co., 315 U.S. 666, 667, 62 S.Ct. 853, 86 L.Ed. 1103; Socony-Vacuum Oil Co. v. Rosen, 6 Cir., 108 F.2d 632; Addressograph-Multigraph Corporation v. American Expansion Bolt & Manufacturing Co., 7 Cir., 124 F.2d 706; Rytex Co. v. Ryan, 7 Cir., 126 F.2d 952; Time, Inc., v. Viobin Corporation, 7 Cir., 128 F.2d 860; Philco Corporation v. Phillips Mfg. Co., 7 Cir., 133 F.2d 663; Adam Hat Stores, Inc., v. Lefco, 3 Cir., 134 F.2d 101; Gum v. Gumakers of America, 3 Cir., 136 F.2d 957. Yet, it can hardly be asserted that the authorities have finally and clearly determined that in such cases the rules upon the substantive law of unfair competition applied under the statutes and decisions of the state in whose territory the federal action is pending constitute the law which must be applied. It is maintainable that the ultimate solution, within the rule declared in Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477; Griffin v. McCoach, 313 U.S. 498, 61 S.Ct. 1023, 85 L.Ed. 1481, 134 A.L.R. 1462; and Sampson v. Channell, 1 Cir., 110 F.2d 754, 128 A.L.R. 394, certiorari denied June 3, 1940, 310 U.S. 650, 60 S.Ct. 1099, 84 L.Ed. 1415, may be that the local law of the state of the forum to be applied is that upon the subject of conflicts. In that contingency, these cases sounding in tort, the Nebraska law of conflicts would make applicable the lex loci (or, to speak more accurately in this situation the leges locorum) delicti. Olson v. Omaha & C. B. St. R. Co., 131 Neb. 94, 267 N.W. 246; McCown v. Schram, 137 Neb. 498, 289 N.W. 890; Id., 139 Neb. 738, 298 N.W. 681.

Either solution involves difficulties if not absurdities whose recognition arises upon their mere suggestion. The application of the lex loci delicti is simple enough if there is a single situs of the tort against which redress is sought; but it becomes complex if not impossible when, as here, there are a multitude of states where the alleged tort is committed with conceivably conflicting laws. And one need hardly point out the probable injustice and confusion which would arise from the determination according to the domestic law of a single state adroitly selected as the locus fori, of issues resulting from tortious acts no one of which occurred in that state, in an action whose object is injunctive relief ultimately on a nation wide pattern,

and with immediate impact only in states far remote from the one whose internal law is urged as controlling. Thus, the gesture towards conformity and uniformity involved in Erie R. Co. v. Tompkins, supra, will surely "hit mark the archer never meant."

But in more practical vein the court is persuaded that here, as in the note to Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 113, 59 S.Ct. 109, 111, 83 L.Ed. 73, it may simply and sufficiently be said: "But no claim has been made that the local law is any different from the general law on the subject, and both parties have relied almost entirely on federal precedents." The second clause of that statement is strictly pertinent here; the first clause practically correct. It appears, first, that there is no definitely determined and directly applicable Nebraska law upon the issue critically involved in these suits; and, secondly, that there is no disparity between the declared views of the Nebraska supreme court and the prevailing American law upon the general subject of unfair competition. The plaintiff correctly asserts that Nebraska has displayed a marked degree of liberality in its rulings upon the subject. But the presently predominant opinion in the nation generally may likewise be regarded as liberal. That there is no disposition in this state to depart from the generally prevailing rule may be inferred from a reading of the last reported Nebraska case upon the point, Personal Finance Co. of Lincoln v. Personal Loan Service, 133 Neb. 373, 275 N.W. 324, which chiefly cites and follows federal authorities.

Except in one instance, the Nebraska cases have been concerned mainly about the proper protection, from piratical appropriation, of established corporate names under which plaintiffs have organized and transacted business. The corporate name "Regent Shoe Manufacturing Company" was protected from invasion in the retail shoe trade in the city of Omaha, but not in the wholesale field in which the plaintiff was not engaged, in Regent Shoe Manufacturing Co. v. Haaker, 75 Neb. 426, 106 N.W. 595, 598, 4 L.R.A.,N.S., 447. "Basket Stores", as a part of the plaintiff's name and the manner of designating retail grocery stores of the corporate plaintiff, was protected from appropriation by the defendant within the plaintiff's limited trade territory in the vicinity of Lincoln, Nebraska, in Basket Stores of Lincoln, Nebraska, v. Allen, 99 Neb. 217, 155 N.W. 893. "Carter Transfer & Storage Company" and certain distinguishing devices drawing attention to the plaintiff's business in Lincoln, Nebraska, were granted security in Carter Transfer & Storage Co. v. Carter, 106 Neb. 531, 184 N.W. 113. "Northwest Ready Roofing Company" was given immunity from invasion in Northwest Ready Roofing Co. v. Antes, 117 Neb. 121, 219 N.W. 848, 849. "Riggs Optical Company", a long established corporate business name, was secured from improper appropriation by an oculist named Riggs in Riggs Optical Co. v. Riggs, 132 Neb. 26, 270 N.W. 667, 668. The corporate name "Personal Finance Company" was held to have been sufficiently established to be entitled to protection against the use of the name, Personal Loan Company, by a concern competing for precisely identical business in a virtually adjacent office building in Personal Finance Co. v. Personal Loan Service, 133 Neb. 373, 275 N.W. 324, 325.

In only one Nebraska case, of which the writer of this memorandum is aware, has a trade name of a product, wholly unconnected with the corporate name of the trader, been protected by injunction. Consolidated Fuel Co. v. Brooks, 91 Neb. 421, 136 N.W. 60, 61. There, the name "Cristo Canon Coal", as applied by the plaintiff in its coal jobbing business to coal sold by it in Nebraska, which was mined in Colorado, was protected from appropriation by a newly organized competitor. But the name "Cristo Canon" was a purely fanciful device of the plaintiff for application in its business to a coal which, at the mines, was known as Carbon Canon Coal. Finally, in Chadron Opera House Co. v. Loomer, 71 Neb. 785, 99 N.W. 649, injunctive relief was denied for the protection of the plaintiff's corporate, and alleged business, name because of the inadequacy of the testimony to establish prior appropriation and popularization.

It may appropriately be added that in most of the Nebraska cases the ultimate protective result is founded substantially on the factor of the confusing employment of the name of an established business by a recent associate in that business bent on the deceptive diversion to himself of its good will. That personal element serves measurably to neutralize such cases as au-

thority upon the broad question of unfairness in competition at arms length between strangers.

It is, therefore, considered that there is no disparity between the pertinent substantive law, if any, as administered in the state courts of Nebraska, and that which is to be gleaned from the American decisions generally, and particularly from the federal court decisions. It may be remarked in passing that no Nebraska statutory enactment requires consideration. And if, in application of the Nebraska rule upon conflicts, the domestic law of some other state or states becomes controlling, let it be noted that no party to either suit has indicated what such local state law should be explored and applied, or wherein, if at all, it differs from the general American rules. Consequently, the question is regarded as purely academic in this instance.

In the Kellogg case the defendant asserts two separate affirmative defenses, which are not alleged in the General Foods case. They should have attention before the consideration of the major issues arising upon the plaintiff's claim, because if they were well taken they might be operative to defeat recovery by the plaintiff irrespective of the merits upon its basic claim.

■ The first of these separate defenses is a charge that in consequence of its written grant to National Tea Company of permission to employ the term "Raisin Bran" as the designation of a bread manufactured and sold in a substantial but defined area by the Tea Company, the plaintiff lost all trademark rights in, and the right to the exclusive use of, the term "Raisin-Bran", if it ever had such rights and, therefore, can not prevail against the defendant in the Kellogg case. The incident at which this defense is aimed arose after the filing of the Kellogg case and during the trial upon its merits of the General Foods case. The time offers a sufficient reason why it is not involved in the General Foods case. Upon being confronted with evidence in the General Foods case of the marketing by the Tea Company in the states of Illinois, Indiana, Iowa, Michigan, Wisconsin, Minnesota and the Dakotas of a bread containing bran and raisins under the name "Raisin-Bran Bread", the plaintiff promptly asserted its right to intercept such marketing; whereupon and while the case was still on trial, the plaintiff and the Tea Company made an agreement whereby the plaintiff consented to the continuance of such sales, limited to bakery products, in the Tea Company's defined area.

The court has examined the authorities cited and considered the arguments made upon this point and has concluded that, regard being had to the facts underlying the written agreement and its own character, the plaintiff did not, through its execution, forfeit any rights which it might theretofore actually have perfected within the narrow limits of its claim. The plaintiff has never extended its claim under the name "Raisin-Bran" beyond its own single product. Bread, cakes, pie and other bakery products are not involved in a market competitive with it. The plaintiff, upon considered authority, could not have prevented the Tea Company's operation. Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713; United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141; American Steel Foundries v. Robertson, 269 U.S. 372, 46 S.Ct. 160, 70 L.Ed. 317; Walgreen Drug Stores v. Obear-Nester Glass Co., 8 Cir., 113 F.2d 956, 962, 963; Philco Corporation v. Phillips Mfg. Co., 7 Cir., 133 F.2d 663, 673. By its contract it suffered—in extreme construction, licensed—the Tea Company to continue what it was always powerless to prevent. This court is unwilling to conclude that through inadvertence it thereby abandoned any rights in the name of its product which had theretofore accrued to it. If, within the thought of the numerous cases cited by Kellogg Sales Company (e. g., Everett O. Fisk & Co. v. Fisk Teachers' Agency, 8 Cir., 3 F.2d 7, and the many cases cited therein), the plaintiff had assumed to assign its alleged trademark, otherwise than as an incident to the sale of the business and good will with which it had been associated, a different result might be reached. But the pleading defendant seems to the court to confer upon the contract a vigor and effect beyond its deserts.

The second asserted special defense of Kellogg Sales Company is that of unclean hands. The premises of this contention explain its absence from the issues in the General Foods case, for in no small measure they might be charged impartially against the General Foods Company and its owned defendant as well as against the plaintiff.

■ The defense of unclean hands in this instance is bottomed chiefly upon the

employment by the plaintiff in the name of its product of the unqualified word, "Bran", and upon certain of its advertising operations. It is asserted, first, that the term "Raisin-Bran", is misdescriptive and deceptive, and purposefully so, chiefly in that it allegedly induces a public opinion that the product's cereal content is whole bran, whereas its bran content is approximately one-third of its total cereal weight; secondly, that the sale of the plaintiff's product under the name "Raisin-Bran" violates the provisions of the Federal Food, Drug and Cosmetic Act of 1938, Title 21 U.S.C.A. §§ 331, 343; thirdly, that in its advertising of its product the plaintiff acts in violation of the Federal Trade Commission Act, Title 15 U.S.C.A. §§ 45, 52, 55, and regulations in furtherance thereof. The defense thus asserted is not considered to be well founded. And this conclusion is reached with due appreciation of the requirements of fair dealing to which a plaintiff subjects himself in his quest of equitable relief in protection of an alleged exclusive franchise.

Upon the general—as distinguished from the statutory—ground of misdescriptive and deceptive branding and labeling, Kellogg Sales Company argues that bran, strictly defined, is the unmixed outer coat of the wheat berry; that it is popularly so understood; and that there is actual deception in the labeling and advertising of a food product as "Bran" when, in fact, the product is not whole bran but a composite product of which bran is only a part.

That position appears to be a narrow and unrealistic one, and to neglect the history of the bran cereal food industry, in the making of which Kellogg Company and its predecessor have had a substantial part. Unquestionably before the development of the breakfast food industry, bran signified to the general public the whole bran content of wheat. It was sold in bulk or in large bags, and usually for stock food. But the public understanding of terms is inconstant and suffers change with altered conditions and usages. During a period of more than thirty-five years, the American public has been instructed in the significance of bran as an element in human food, and as a separate article for human consumption. Even before 1925, bran type breakfast foods were on the market and had been liberally advertised, and in the intervening eighteen years this advertising

has been increased in striking measure. Some of them have been composed wholly of bran, generally with added flavoring agencies; others of whole wheat with added bran in varying percentages compressed into flakes or shreds. The evidence in these cases speaks of the marketing of bran type cereal foods in terms of hundreds of millions of dollars and billions of cartons and of their advertising expense in terms of tens of millions of dollars. Though some bran type cereals may have been sold in bulk, they have quite generally been marketed in packages. Both Kellogg Company and Post, as the predecessor of General Foods Corporation, were pioneers in the field. Generally, too, though not invariably in the branding and advertising of bran type cereals, there has been no careful differentiation in the names of the several products, responsive to the percentages of their bran content. Thus Kellogg Company in the marketing of what it now calls "Kellogg's 40% Bran Flakes", admittedly having a bran content no higher than forty per cent, originally sold it as "Kellogg's Bran Flakes", and some times as "Kellogg's Bran Flakes With Other Parts of Wheat", and applied to it the more exact name of "Kellogg's 40% Bran Flakes", only in 1938 or 1939. Post also marketed a part bran product now known as "Post's 40% Bran Flakes" which, essentially with its present formula, was branded for many years, beginning in 1922 simply as "Post's Bran Flakes", the insertion of the phrase "40%" having occurred at relatively the same time as the like rebranding by Kellogg Company. Concurrently with the sale of part bran cereals known simply as "Bran Flakes", producers, including Kellogg Company, have marketed whole bran cereals under such names as "All Bran" and "100% Bran". Other bran type cereals have been marketed under fanciful names, but their sellers have advertised them as "bran foods" or "bran cereals". In the light of the history of the bran type cereal food industry and its advertising, the court has concluded, and has found as a fact, that, by the consuming and buying public, the term "bran" when applied to a packaged cereal product, offered for sale for human consumption in a grocery store—as distinguished from a stock food market—is understood and for many years has been understood as a dry prepared breakfast cereal food for human consumption, containing a quantity of bran, in varying de-

grees, higher than that found in whole wheat. The public simply could not have escaped such an understanding.

That the court's conclusion thus reached is not unfounded may be gathered from the following questions and answers in the direct examination, as a witness in the General Foods case for the defendant, of its own vice-president and merchandising manager, Mr. C. E. Eldridge:

"2067 Q. Now, what do you understand by the term 'bran' as applied to your business? A. Bran?

"Q. Yes, bran or bran cereal. A. Well, my understanding of bran cereal is one in which there is an amount of bran greater, perhaps than that originally present in whole grain. In other words, added or additional extra bran added to the original grain."

It is also consonant with many essentially similar answers made by miscellaneous witnesses in reply to questions seeking their understanding of the terms "bran" and "raisin bran".

The court, therefore, is satisfied in point of fact that the plaintiff's employment of the brand "Raisin-Bran" neither confused, misled nor deceived the food purchasing public, whether wholesale or retail grocers or ultimate consumers; and that such deception or confusion was never either probable or an object of the plaintiff.

Let it be remarked, at this point, that the court has not been unmindful of certain evidence produced by Kellogg Sales Company in the form of selected specifications, (a) from the Federal Standard Stock Catalog defining with technical nicety both prepared "Wheat-bran products" and "Wheat-products-flakes (25 per cent to 40 per cent bran)" prepared under authority of Title 41 U.S.C.A. § 7(1) and (2), wherein the elements and characteristics of certain supplies "for the executive departments and other Government establishments in Washington" are declared; and (b) of certain bureaus of various states respecting their required crude fibre content for bran foods to be purchased in institutional feeding. But these documents, though worthy of consideration, can not, in the estimation of the court, be controllingly instructive respecting the impression upon the mind of the American food consuming public of nearly forty years of fairly consistent selling and advertising as bran cereals of products of which bran has been a distinguish-

ing though not the exclusive element. Nor can they supersede the impression which, on the whole, the court has gathered from the testimony of individual witnesses. The court regards as quite uninstructive (a) the definition, by the Federal Security Administrator (6 F.R. page 2574, May 27, 1941) of the milling process in making wheat, and (b) various definitions of bran by state boards which patently have reference to that material as stock food.

The element of advertising may be adverted to briefly. The plaintiff's advertising is criticized variously, but chiefly because of (a) its emphasis upon its brand of "Raisin-Bran", (b) its advertising of its product in newspapers, magazines, and pamphlets, upon cartons, and in radio broadcasts as a superior bran food, a bran product, and bran flakes and raisins, and (c) its emphasis through many years upon the alleged laxative properties of its product, arising from its bran content. Points (a) and (b) seem sufficiently to have been discussed. It may be asserted that the plaintiff, in common with all bran cereal producers, for many years overemphasized in advertising the probably valid though mild laxative virtues of its product. And Kellogg Company provided the pattern for much of this extravagance. Rather by way of explanation of the plaintiff's participation in the common practice than as an intimation of the untenable opinion that Kellogg Company's course would necessarily estop it to urge the defense of unclean hands if it were otherwise available, the court is prompted to mention a fairly pertinent and well authenticated admonition. John VIII 7. See also Coca-Cola Co. v. Koke Co., 254 U.S. 143, 145, 147, 41 S.Ct. 113, 65 L.Ed. 189. For approximately four years the plaintiff has largely discontinued its emphasis upon this point. That neither Kellogg's nor General Foods' conversion is wholly without reservation is gathered from the following excerpts copied from the publicity appearing upon the edges of the cartons in which their respective competing products are now packaged and sold: From Kellogg's: "The benefit of bran in helping supply the bulk-forming properties lacking in so many diets is well known. In Kellogg's Raisin 40% Bran Flakes you receive a most delightful cereal possessing bulk forming properties—plus the taste thrill of sweet, plump seedless raisins." From General Foods': "Five reasons why you will enjoy Post's Raisin Bran. * * *

3. *Bulk for regularity*—People whose systems are sluggish, due to lack of bulk in the diet, find Post's Raisin Bran, eaten daily, a real help."

Supporting the general assertion of the plaintiff's deceit, Kellogg Sales Company cites and relies in part upon Federal Trade Commission v. Standard Education Society, 302 U.S. 112, 58 S.Ct. 113, 82 L.Ed. 141, in which it was held fraudulent to sell a loose-leaf encyclopedia upon the representation that the basic volumes were being presented to the buyer whose undertaking was to pay only for future maintenance when, in fact, the price included the cost of the basic volumes to an ordinary buyer; Federal Trade Commission v. Winstead Hosiery Co., 258 U.S. 483, 42 S.Ct. 384, 66 L.Ed. 729, in which the labeling of goods with devices indicating a pure wool content, notwithstanding none of them were pure wool and some had a wool content of as little as ten percent, was denounced; Worden & Co. v. California Fig Syrup Co., 187 U.S. 516, 23 S.Ct. 161, 47 L.Ed. 282, where injunctive relief was denied to a plaintiff for a brand, Syrup of Figs, whose product did not contain figs but had as its active agent a far different element; Krauss v. Jos. R. Peebles' Sons Co., C.C., 58 F. 585, in which similar denial occurred where the plaintiff branded whiskey as a specific well known branded product, when in truth the whiskey sold was a blending containing as little as one-third of the advertised brand; Manhattan Medicine Co. v. Wood, 108 U.S. 218, 2 S.Ct. 436, 27 L.Ed. 706, in which injunctive relief was refused because in the bottles containing its product the plaintiff boldly and falsely identified a well known and highly regarded maker and location as the source of its remedy; Renaud Sales Co. v. Davis, 1 Cir., 104 F.2d 683, denying relief to a plaintiff selling a diluted perfume under its former celebrated brand for a concentrated product; and Brooten v. Oregon Kelp Ore Products Co., 9 Cir., 24 F.2d 496, in which it was indicated that a branding would be invalid if it consisted of a combination of two words indicative of materials neither of which was present in the branded substance. In harmony with what has hitherto been said upon the general question of deceptive labeling and advertising, the court regards these, and other similar opinions as inapplicable to the issue, in these cases, of unclean hands. The requisite element of customer deception is absent here.

■ For the same reasons, the court regards as untenable the charges against the plaintiff of misleading labeling under the Federal Food and Drug Act, and false and misleading advertising under the Federal Trade Commission Act. Both counts rest upon the premise of the misleading and deception of the plaintiff's trade; and the court considers that such misleading and deception did not occur, were never designed or intended, and were never a likely consequence of the plaintiff's course of business.

The defense is not necessarily to be rejected because the alleged violation of the statutes is asserted defensively by a private litigant, rather than affirmatively by a governmental instrumentality, nor because of the acknowledged fact that the plaintiff's operations have never encountered governmental censure, successful or otherwise. But the facts, in their proper relation to the history of the cereal food industry, simply do not persuade the court that the statutes have been violated. The court is of the opinion that the text must be appraised in its abundant context.

The comment that the issues of abandonment and unclean hands do not appear in the General Foods case should be limited to the formal pleadings. The questions having arisen during its trial are both discussed to some extent in the briefs.

Preliminary considerations eliminated, attention is now directed to the principal question, whether the plaintiff has affirmatively established its right to injunctive relief. In this behalf, the court considers that judgment must be adverse to the plaintiff; and in part by the logic of some of the very reasoning by which it has already been absolved from the imputation of unclean hands.

■ Such rights in its name and product as the plaintiff may have are not impaired by the fact that it has never been the manufacturer of the product. It has consistently controlled such manufacture and might well be said to have manufactured by agent. "It is not important that the plaintiff does not himself manufacture the articles which he sells and upon which he places his trademark. It is sufficient that the goods are manufactured for him, and that he owns or controls the goods which he offers for sale, and upon which he places his trade-mark or trade name," Charles Broadway Rouss, Inc., v. Winchester Co., 2 Cir., 300 F. 706,

722, 723. See, also, McLean v. Fleming, 96 U.S. 245, 24 L.Ed. 828; C. A. Briggs Co. v. National Wafer Co., 215 Mass. 100, 102 N. E. 87, Ann.Cas.1914C, 926.

■ Upon another phase of these cases the court has already declared its finding that the two nouns joined in the name of the plaintiff's product are descriptive of its essential and distinguishing ingredients. As to the element of raisins there can be no possible question of the brand's exact descriptiveness. As to the cereal element, the name is, at the least, strikingly suggestive, and, as the court has already declared, it is wholly descriptive when it is employed in relation to a bran type breakfast food sold in packages at grocery stores for human consumption. As such, it is incapable of appropriation as an exclusive trademark for the product to which it has been applied.

That the plaintiff itself has heretofore regarded the name of its product as descriptive of its contents can not be doubted. For example, upon a carton (exhibit 33 in General Foods case) wherein during its early operations in the cereal trade it packaged and sold Durum Bran, another of its products, it printed this advertising material, "If you like raisins use Raisin-Bran which is Durum Bran with raisins added for flavor and additional food value." Then, on a side panel on its first Raisin-Bran carton appeared the following: "The latest and really the superior Bran food, containing the laxative value of Bran, the valuable food elements of Durum Whole Wheat and the iron and grape sugar of raisins." And, on the face of its second Raisin-Bran carton, immediately following the name Raisin-Bran, appeared the words "With Whole Durum Wheat Toasted"; while on one of its side panels following the name appeared the words: "with whole durum wheat". And in its advertising it has frequently used such phrases as "Raisin-Bran is the most palatable bran cereal on the market", "It is crispy bran flakes mixed with California raisins", and "Bran flakes with fresh California raisins —good and good for you." And it has contemporaneously sold Raisin-Bran and Durum Bran, by that precise name and advertised (supra) that "Raisin Bran is Durum Bran with raisins added", which was a strictly correct description until, some years later, the plaintiff replaced Durum wheat and bran with ordinary whole wheat and bran in the cereal portion of Raisin-Bran.

■ The court has considered carefully and rejected as untenable the plaintiff's allegation that its brand is arbitrary and fanciful. In this relation trade names are arbitrary or fanciful when they do not, by their usual and ordinary meaning, denote or describe the products to which they are applied, but rather come to indicate their purpose by application and association. Creswill v. Grand Lodge, 133 Ga. 837, 67 S.E. 188, 191, 134 Am.St.Rep. 231, 18 Ann.Cas. 453. Examples of arbitrary or fanciful designations in the breakfast cereal trade are "Pep", "Grape Nuts" "Vigor" and the like. They need only to be mentioned to exclude from their classification such a brand name as Raisin-Bran in its present connotation.

■ It is true that the plaintiff's product name has been registered by the plaintiff under the Trade Mark Act of 1920. It was not registerable under the Trade Mark Act of 1905; and an application by the plaintiff for such registration was denied before the making of the application for registration under the Act of 1920. But the parties all acknowledge that registration under the Act of 1920 does not confer any substantive right on the registrant (vide supra) and the plaintiff does not rest its claim upon any alleged substantive right issuing from the registration. It may be mentioned also that no presumption of validity arises from registration under the Act of 1920. Armstrong Paint & Varnish Works v. Nu-Enamel Corporation, 305 U.S. 315, 322, 59 S.Ct. 191, 83 L.Ed. 195.

■ In the relatively early case of Canal Co. v. Clark, 80 U.S. 311, 323, 13 Wall. 311, 323, 20 L.Ed. 581, the rule touching the availability of descriptive names as trademarks was stated thus: "Nor can a generic name, or a name merely descriptive of an article of trade, of its qualities, ingredients, or characteristics, be employed as a trade-mark and the exclusive use of it be entitled to legal protection." That statement remains essentially unchallenged and is not impaired by the secondary meaning rule. (Vide infra) The principle underlying the foregoing statement was well expressed in the later case of Elgin National Watch Co. v. Illinois Watch-Case Co., 179 U.S. 665, 673, 21 S.Ct. 270, 273,

45 L.Ed. 365. Referring to the expression "trademark", the court said: "The term has been in use from a very early date, and, generally speaking, means a distinctive mark of authenticity, through which the products of particular manufacturers or the vendible commodities of particular merchants may be distinguished from those of others. It may consist in any symbol or in any form of words, but as its office is to point out distinctively the origin or ownership of the articles to which it is affixed, it follows that no sign or form of words can be appropriated as a valid trademark which, from the nature of the fact conveyed by its primary meaning, others may employ with equal truth and with equal right for the same purpose." More modern applications of the principle are available. "A name which is merely descriptive of the ingredients, qualities or characteristics of an article of trade cannot be appropriated as a trade-mark and the exclusive use of it afforded legal protection. The use of a similar name by another to truthfully describe his own product does not constitute a legal or moral wrong, even if its effect be to cause the public to mistake the origin or ownership of the product." William R. Warner & Co. v. Eli Lilly & Co., 265 U.S. 526, 528, 44 S.Ct. 615, 616, 68 L. Ed. 1161. "The plaintiff has no exclusive right to the use of the term 'Shredded Wheat' as a trade name. For that is the generic term of the article, which *describes it with a fair degree of accuracy;* and is the term by which the biscuit in pillow-shaped form is generally known by the public. Since the term is generic, the original maker of the product acquired no exclusive right to use it. As Kellogg Company had the right to make the article, it had, also, the right to use the term by which the public knows it." (Emphasis added.) Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 116, 59 S.Ct. 109, 112, 83 L.Ed. 73. See also Standard Paint Co. v. Trinidad Asphalt Mfg. Co., 220 U.S. 446, 453, 31 S.Ct. 456, 55 L.Ed. 536; Trinidad Asphalt Mfg. Co. v. Standard Paint Co., 8 Cir., 163 F. 977, 979 (affirmed in case last cited); Brooten v. Oregon Kelp Ore Products Co., 9 Cir., 24 F.2d 496, 497; Richmond Remedies Co. v. Dr. Miles Medical Co., 8 Cir., 16 F.2d 598, 601; Ungles-Hoggette Mfg. Co. v. Farmers' Hog & Cattle Powder Co., 8 Cir., 232 F. 116, 117 (affirming District court for this district).

The assertedly liberal Nebraska supreme court adheres to the rule. "Courts are quite unanimous in declaring that descriptive terms or generic words are not susceptible of exclusive appropriation by any one, but may be used by all the world in an honestly descriptive or nondescriptive manner. This rule rests upon the theory that every one should have the right to properly describe his goods or business, and should be able to use all terms necessary or appropriate for that purpose." Personal Finance Co. v. Personal Loan Service, 133 Neb. 373, 378, 275 N.W. 324, 327. The same case, with credit to Iowa Auto Market v. Auto Market & Exchange, 197 Iowa 420, 197 N.W. 321, makes the declaration that, "as a matter of law, no one is entitled to the exclusive use of the descriptive adjectives of the language."

The full appraisal of the effect upon this case of the rule denying the availability as an exclusive trademark of a descriptive phrase may well be emphasized by exemplification. Writing, in 1908, the prevailing opinion of the circuit court of appeals for this circuit, in Trinidad Asphalt Mfg. Co. v. Standard Paint Co., 8 Cir., 163 F. 977, 979, Judge Hook compiled an excellent list of some of the many instances in which the rule had theretofore been applied. That list by reference is here resorted to. In the Trinidad case the word "Ruberoid" as a misspelled version of "Rubberoid" was rejected as descriptive, when applied to roofing material containing no rubber but having some of the properties of rubber. In later cases the rule has required the rejection as exclusive trade names of such terms as "Steem-Electric", in Steem-Electric Corporation v. Herzfeld-Phillipson Co., 7 Cir., 118 F.2d 122; "Kelp Ore", in Brooten v. Oregon Kelp Ore Products Co., 9 Cir., 24 F.2d 496; "Dridip" in Ungles-Hoggette Mfg. Co. v. Farmers' Hog & Cattle Powder Co., 8 Cir., 232 F. 116; "Nervine" in Richmond Remedies Co. v. Dr. Miles Medical Co., 8 Cir., 16 F.2d 598; "Coco-Quinine" in Warner & Co. v. Eli Lilly & Co., 265 U.S. 526, 44 S.Ct. 615, 68 L.Ed. 1161; "Toasted Corn Flakes" in Kellogg Toasted Corn Flake Co. v. Quaker Oats Co., 6 Cir., 235 F. 657; "Shredded Wheat" in Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 59 S.Ct. 109, 83 L. Ed. 73, 77; "Oaties" in Quaker Oats Co. v. General Mills Co., 7 Cir., 134 F.2d 429; "Cellophane" in Du Pont Cellophane Co. v.

Waxed Products Co., 2 Cir., 85 F.2d 75, certiorari denied E. I. Du Pont De Nemours & Co. v. Waxed Products Co., 299 U.S. 601, 57 S.Ct. 194, 81 L.Ed. 443; "No-D-Ka" in No-D-Ka Dentifrice Co. v. S. S. Kresge Co., D.C.Mass., 24 F.2d 726. The catalogue might be expanded almost indefinitely with identical significance.

■■■ Another conclusion will be obvious from the foregoing citations. No advantage can result to the plaintiff from the manner in which it has consistently written its brand. The ordinary sound and significance persisting with relative fidelity, no advantage is to be derived from the misspelling, abbreviation, mutilation, capitalization, or hyphenation of an otherwise descriptive name.

The plaintiff argues earnestly that it is entitled to the relief it seeks upon the basis of the doctrine of secondary meaning. The doctrine is asserted to rest upon certain celebrated English cases. Reddaway v. Banham, 1896, 13 R.P.C. 218, in which a limited and qualified protection was accorded to the plaintiff's product, "camel-hair belting", and Wotherspoon v. Currie, 1872, 5 L.R.E. & I.App. 508, and Montgomery v. Thompson, 1891, 8 R.P.C. 361, 41 Ch.D. 47, in the last two of which protection was afforded to names originally local in character which through long and favorable use had come to signify with respect to the specific products with which they had been associated (*Glenfield* starch, and *Stone* ale), "the designation of an article manufactured by" the claimants of the names. That the principle of secondary meaning issuing from the thought of these cases has become a part of the modern American law of unfair competition is unquestioned and acknowledged by all parties to the suit.

■■■ The doctrine of secondary meaning has been given judicial definition. It is explained thus in Richmond Remedies Co. v. Dr. Miles Medical Co., 8 Cir., 16 F.2d 598, 602: "Though a descriptive word cannot * * * become the subject of a trade-mark, nevertheless, when a person has adopted and for a long time used a word or words, descriptive or otherwise, as a trade-name until it has acquired a new or secondary meaning, viz. a designation of a particular product or business as belonging to that person, the courts will protect him in his rights in relation to his trade-name. This is known as the doctrine of secondary meaning." See, also,

opinion of Fuller C. J., in Elgin National Watch Co. v. Illinois Watch Case Co., 179 U.S. 665, 673, 21 S.Ct. 270, 45 L.Ed. 365; Charles Broadway Rouss, Inc., v. Winchester Co., 2 Cir., 300 F. 706, 715, 716.

■■■ But, as the court is persuaded, the plaintiff has wholly failed to sustain the burden resting upon it to establish the acquisition by its brand Raisin-Bran of a secondary significance. That burden is not a light one or easily sustained. Textually it is declared that "The phrase 'secondary meaning' * * * does not mean a subordinate or rare significance. It means rather a subsequent significance' added to the previous meaning of the designation and becoming in the market its usual and primary significance." Restatement "Torts" Vol. 3, p. 560, Sec. 716(b). Speaking as recently as 1938 the Supreme Court in Kellogg ˙ Co. v. National Biscuit Co., 305 U.S. 111, 118, 119, 59 S.Ct. 109, 113, 83 L.Ed. 73, asserted: "It is contended that the plaintiff has the exclusive right to the name 'Shredded Wheat' because those words acquired the 'secondary meaning' of shredded wheat made at Niagara Falls by the plaintiff's predecessor. There is no basis here for applying the doctrine of secondary meaning. The evidence shows only that due to the long period in which the plaintiff or its predecessor was the only manufacturer of the product, many people have come to associate the product, and as a consequence the name by which the product is generally known, with the plaintiff's factory at Niagara Falls. But to establish a trade name in the term 'Shredded Wheat' the plaintiff must show more than a subordinate meaning which applies to it. It must show that the primary significance of the term in the minds of the consuming public is not the product but the producer. This it has not done. The showing which it has made does not entitle it to the exclusive use of the term shredded wheat but merely entitles it to require that the defendant use reasonable care to inform the public of the source of its product." (The pertinence of the final sentence of the quotation in another relation will be recalled later). See also Steem-Electric Corporation v. Herzfeld-Phillipson Co., 7 Cir., 118 F.2d 122; Centaur Co. v. Heinsfurter, 8 Cir., 84 F. 955; Du Pont Cellophane Co. v. Waxed Products Co., 2 Cir., 85 F.2d 75.

The hard task, thus assumed, the plaintiff has not performed. Its purpose and

design to appropriate its brand name as its exclusive prerogative are manifest from the evidence and have been affirmed in specific findings by the court. But the result desired is not established. See Du Pont Cellophane Co. v. Waxed Products Co., 2 Cir., 85 F.2d 75, 81. The court has heard and upon this issue has particularly reviewed and reread the oral evidence, both presented through witnesses appearing personally before the court and submitted by deposition; and is wholly satisfied that no public understanding either of the plaintiff as the origin of Raisin-Bran or of Raisin-Bran as a product of the plaintiff has even nearly been established.

The difficulty of establishing by evidence the significance of a term of this character in the minds of purchasers and the interested public is appreciated by the court and the plaintiff's effort in that direction has been appraised sympathetically. But, even so, it is inadequate. It can not be asserted accurately that out of all the testimony upon this issue any discernible or accurate pattern of understanding emerges; but so far as there is any predominance it is to the effect that down to, and during, the trial of these cases, Raisin-Bran to the public generally signified a breakfast cereal, "consisting of", "composed of", "containing or including" raisins and bran. All of the quoted participles and several more to like effect are included in the expressions of the witnesses. In other words, despite its monopoly of the field during seventeen years and its manifest purpose to individualize the name of its product, the plaintiff has not established for the name any significance other than descriptive. And in this connection the court considers that the long history of the marketing of bran type cereals upon the American food market has probably been effective to prevent a descriptive name within that field from acquiring a secondary significance within the proper meaning of that phrase.

In passing, it may be remarked that the court has not regarded as persuasive certain alleged expert testimony, produced by the plaintiff from among (a) its own salesmen and representatives, and (b) miscellaneous merchants, wholesale or retail, largely customers of the plaintiff. Upon mature examination it is regarded as incompetent. But even accepting it as admissible, it can not be effective to efface the negative conviction mentioned in the preceding paragraph.

The plaintiff in support of its resort to the secondary meaning doctrine relies upon several elements which have been judicially rejected in well reasoned cases. Among these, without grouping them exactly as the plaintiff does, are: (a) An exclusive and long continued use of its designation during a period when no competitor was in the field, vide: Kellogg Toasted Corn Flake Co. v. Quaker Oats Co., 6 Cir., 235 F. 657, 665, 666; Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 118, 119, 59 S.Ct. 109, 83 L.Ed. 73, 78; (b) a wide distribution of its product, vide: Kellogg Toasted Corn Flake Co. v. Quaker Oats Co., supra, and Kellogg Co. v. National Biscuit Co., supra; (c) a wide advertising campaign and large expenditures for advertising the product under the designation, vide: Kellogg Co. v. National Biscuit Co., supra; Du Pont Cellophane Co. v. Waxed Products Co., supra; and (d) identification of the product by its designation on the part of a *substantial portion of the purchasing public;* understanding by a *substantial portion of the purchasing public* and most of the retail and wholesale trade that the name signifies a single thing coming from a single source and covers a product made and distributed exclusively by the person who claims the brand, a recognition in the product of superior quality or excellence by a *substantial portion of the purchasing public,* vide: Restatement, Torts, supra; Kellogg Co. v. National Biscuit Co., supra; Du Pont Cellophane Co. v. Waxed Products Co., supra; Chivers & Sons v. Chivers & Co., Ltd., 17 R.P.C. 420; Cellular Clothing Co. v. Maxton & Murray, L.R. A.C. 326, 16 R.P.C. 397, 68 L.J., P.C. 72, 80 L.T.Rep. 809. See, also, Bayer Co. v. United Drug Co., D.C.N.Y., 272 F. 505, 510, wherein the understanding which is to be given consideration is asserted to be that of the general consuming public, rather than dealers in merchandise.

Essentially, the foregoing tests proposed by the plaintiff rest upon the vigorous promotion and marketing of the maker's product by its name in an uncompetitive field during a substantial period of time and the results in public understanding which it is assumed will ensue therefrom. The court has already expressed its adverse conclusion upon the testimony touching the creation of such understanding in fact. In dealing with a similar situation involving a very well known product it has been said: "From 1898 to 1906 the predeces-

sors of appellant had a virtual monopoly of the food product in question and likewise of the term 'Sanitas Toasted Corn Flakes,' and so, inclusively, of the words 'Toasted Corn Flakes'; but this was only because during that period no one else was either making or dealing in the article. The employment of descriptive words under such a condition of trade as this, does not give to the words a secondary meaning denoting only the maker's product; evidence that such a meaning is so acquired is of slight value; this is for the reason that in such circumstances the words could not refer to any product except the single and particular one so monopolized; and, consequently, the occasion for associating the words with the maker of the product does not arise, as it must when two or more competitors are making and selling similar products." Kellogg Toasted Corn Flake Co. v. Quaker Oats Co., 6 Cir., 235 F. 657, 665, 666. And many cases, English, Canadian and in the courts of the United States concur in that thought.

Questioning the pertinence of Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73, frequently cited herein, the plaintiff asserts that it and similar cases, e. g. Singer Manufacturing Co. v. June Manufacturing Co., 163 U.S. 169, 16 S.Ct. 1002, 41 L.Ed. 118, and Centaur Co. v. Heinsfurter, 8 Cir., 84 F. 955, are distinguishable from the instant proceeding upon the ground that they involved instances where patents had expired and the names in question were those which had been applied to the products during the term of the patent monopoly. But it is believed that upon the issues involved here no distinction exists save in the method by which certain terms become a part of the public domain in commerce. The plaintiff's position was asserted in Trinidad Asphalt Mfg. Co. v. Standard Paint Co., 8 Cir., 163 F. 977, 982, and received the following answer: "True, in both these cases there were patents which had expired, and the names 'Singer' and 'Castoria' had become the generic names of the articles during the existence of the monopoly. When the patents expired, and the exclusive right to manufacture ceased, the right to use the names also became a public one through a species of dedication. But in respect of the question now being considered those cases are indistinguishable in principle from the one before us. It is immaterial that names like 'Singer' and 'Castoria' became public property by acquiescence of those who first employed them, instead of being naturally so by reason of structure and original meaning, as is the case with an ordinary appellative like 'rubberoid.' The important thing is the fact that they are public property, not how they became so. If they are, it follows from that quality alone that all may truthfully apply them to their products, and that no one can lawfully monopolize them. Though the cases cited also involve other questions, they recognize and enforce the established rule that unfair competition cannot arise from the mere use of words belonging to the public accompanied by a fair and truthful statement of the ownership and source of manufacture." See, also, Saxlehner v. Wagner, 216 U.S. 375, 380, 381, 30 S.Ct. 298, 54 L.Ed. 525.

And so here, what the court concludes and declares is that, "by reason of structure and original meaning" the term Raisin-Bran was in its inception a descriptive term and therefore in the public domain, and that its use by the plaintiff has not been effective to withdraw it from the public domain. In which situation, it is considered that the reasoning of the criticised cases is of some significance upon the present issue.

The plaintiff insists that its position is to be sustained upon the authority of the Coca-Cola cases, chief among which is Coca-Cola Co. v. Koke Co. of America, D.C., 235 F. 408; Id., 9 Cir., 255 F. 894; Id., 254 U.S. 143, 41 S.Ct. 113, 65 L.Ed. 189. But the Coca-Cola trademark has registered under both the act of 1881, 21 Stat. 502, and that of 1905. Upon this point the plaintiff argues that the registration of Coca-Cola under the act of 1905 conferred no rights upon the registrant beyond those received by the plaintiff under the act of 1920. But a careful reading of Thaddeus Davids Co. v. Davids Manufacturing Co., 233 U.S. 461, 34 S.Ct. 648, 58 L.Ed. 1046, would seem to lead to the contrary conclusion. (See especially language on page 470 of 233 U.S. and the parallel pages of the Supreme Court Reporter and the L.Ed.). Upon the issue of the acquisition of a secondary significance, the facts respecting the Coca-Cola product are universally recognized as so exceptional as almost to stand alone. There is no historical parity between the history of Raisin-Bran and that of Coca-Cola.

This court can not conceive of a product history more persuasive of the acquisition in fact of a strict secondary meaning than that of Coca-Cola. Besides, as has already been noted, the congressional inference of the acquisition of a valid secondary meaning has been asserted as a basis for the allowance of the registration under the 1905 Act of descriptive trade names for which a use by the registrant during the period of at least ten years before the passage of the act could be established. See citation supra to Davids case.

In approaching the question whether there is actionable unfairness in the competitive technique of the defendants, the court recognizes that the two cases diverge sharply in their facts. The defendants are competing separately, and each in its own way. To begin with they have branded their respective products differently. General Foods Corporation calls its product, Post's Raisin Bran. Kellogg Company simply prefixes the words Kellogg's Raisin, to the name of its familiar product, 40% Bran Flakes and uses the name, Kellogg's Raisin 40% Bran Flakes.

It appears clear to the court that here, as in Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 118, 119, 59 S.Ct. 109, 113, 83 L.Ed. 73, "The showing which it (the plaintiff) has made does not entitle it to the exclusive use of the term * * * but merely entitles it to require that the defendant(s) use reasonable care to inform the public of the source of (their) product." Upon this branch of the case the law is settled that competition is not forbidden but rather unfairness in competition and that the essence of actionable unfairness in competition is the creation by one come newly into a competitive field of a situation that is reasonably calculated to result in the passing off of his goods as those of his competing predecessor in the market. Again, the new competitor is not held to the obligation of an insurer against some confusion, but is required only to use reasonable care to inform the public of the source of his product, to use every reasonable means to prevent confusion. Pointedly, he is not obliged so to guard his competitive methods that even the negligent or inattentive purchaser will be protected from confusion. As the cases in some instances have put it, he is not required to make the market "fool proof". Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 119, 59 S. Ct. 109, 83 L.Ed. 73; Quaker Oats Co. v. General Mills, 7 Cir., 134 F.2d 429; Allen B. Wrisley Co. v. Iowa Soap Co., 8 Cir., 122 F. 796; Viavi Co. v. Vimedia Co., 8 Cir., 245 F. 289, certiorari denied 246 U.S. 664, 38 S.Ct. 334, 62 L.Ed. 928; Trinidad Asphalt Mfg. Co. v. Standard Paint Co., 8 Cir., 163 F. 977; Richmond Remedies Co. v. Dr. Miles Medical Co., 8 Cir., 16 F.2d 598, 603; Postum Cereal Co. v. American Health Food Co., 7 Cir., 119 F. 848.

It is acknowledged, and found to be a fact, that both defendants entered the field deliberately and after careful study of the existing marketing conditions. Both entered actively into the plaintiff's most profitable territory in the southern states. Both advertised extensively, by radio, and otherwise, recommending their respective products, General Foods Sales Company's as Post's Raisin Bran, and Kellogg Sales Company's as Kellogg's Raisin 40% Bran Flakes, though in the publicity touching the products each frequently characterized its product as a raisin bran cereal.

In the findings of fact in the separate cases the court has undertaken to set out in exact detail the descriptions of the cartons in which the competing products are packaged and sold, especially as to their faces. These descriptions will not be repeated here, except for the assertion that, while the cartons are relatively identical in size, they are not otherwise similar. In their color schemes they are very different, each from both of the others. The defendant in the General Foods case distinguishes its product by placing the word, Post's, its familiar trademark name, in clear blue letters on a white field conspicuously above the words, Raisin Bran, indicating the name of the product. Likewise, Kellogg Company packages its product in a carton identical in general structure and color with the cartons in which, for many years, it has packaged and sold nearly all of the units of its entire cereal line, and places its trademark name, Kellogg's, in bright red script on a clear white field just above the name of its product. With all three cartons under long and careful scrutiny, the court can observe no reason for customer confusion as between them. They simply do not resemble each other.

The court is persuaded, therefore, that in the physical appearance of the containers in which the products have been marketed, the several defendants have used due and reasonable care to distinguish their respec-

tive products from each other and from that of the plaintiff. And the descriptive name Raisin Bran being available to either of them, such due and reasonable care is the measure of their duty in the matter of packaging. The court considers that there is nothing legally objectionable in the employment by Kellogg Company of the name, Raisin 40% Bran Flakes, and that it might with propriety have utilized the exact name Raisin Bran, as did General Foods Corporation, assuming, of course, that it did not employ it without due care to give notice of itself as the origin of its product.

■ Neither does the court perceive any exceptionable practice in selling on the part of either defendant. The plaintiff points out in its petition (supra) that Kellogg Company on its cartons employs two customer attraction devices that are similar to parts of the plaintiff's carton; First a picture of a cereal bowl, partially filled with the product and cream; and secondly the words, Cereal with Fruit, which approximate the phrase, "Cereal and Fruit," on plaintiff's package. The elimination of these devices, of course, is not the prime objective of the plaintiff's suit in the Kellogg case. They are scarcely more than incidental details, Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 120, 121, 59 S.Ct. 109, 83 L.Ed. 73. But the court also considers that in the light of the whole evidence they are not objectionable. The pictured bowl can not be the subject of exclusive use, for it is and long has been a common suggestive item. And it is, and for many years has been, employed very largely in the packaging of cereal products. More than a hundred different specimen cartons were introduced in evidence in the Kellogg case, showing the employment of this general form of display by Kellogg Company and other companies in packaging and advertising cereals and similar products. Nor is the phrase, cereal and fruit, which is an exact description of the product in the package either deceptive in fact or the subject of any merchandiser's exclusive appropriation.

■ Finally the evidence upon the issue of actual customer confusion is not affirmatively convincing. To be sure, some instances are shown of customers at self serve retail grocery stores who, during the early days of competition, inattentively selected a competing product when they desired to secure the plaintiff's with which alone they had theretofore been acquainted. But within the rules of law above suggested that is not the test of unfair competition or even of customer confusion. Then, too, for some period following the advent of the Kellogg and Post products, customers ordering Raisin Bran without other particularization in service grocery stores, and expecting to receive the plaintiff's product (which originally was the only product of that character of which they knew), were frequently served with one or another of the competing cereals. Grocers explained these incidents variously, some saying that they delivered "whichever raisin bran was handy", or "whichever raisin bran was in stock", and a few, more frank perhaps than the others, "whichever one was the more profitable to the seller". Like incidents, though very few in number, occurred in sales from wholesalers to retailers. But in both the wholesale and the retail trade, the practice developed quickly of inquiring of the purchaser which brand was desired and making delivery accordingly if the preferred item was available.

On the whole evidence upon the issue of confusion in ultimate marketing, the court is satisfied that there is a failure to show any passing off for the plaintiff's product of the cereal of either defendant; and certainly that there is an utter failure to establish any design or intention on the part of either defendant to that end. Each defendant urges convincingly in its own behalf that its greatest asset in its selling operations in its field is its own registered brand, "Kellogg's" or "Post's" as the case may be, and that its brand has here been used, and properly and successfully used to distinguish its product and to prevent confusion.

■ The plaintiff argues correctly that the employment, by one engaged in unfair competition, of his own registered brand or mark, especially if it is minimized or employed craftily or deceptively, will not absolve him from the imputation of unfairness, and may even aggravate his tortious conduct. But where the competitive field is available, the cases make it manifest that the clear and legible application of a familiar and identifying producer's trademark name is a potent distinguishing device and a badge which is substantially persuasive in negativing either confusion or the purpose to confuse. And particularly is that true when otherwise the marketing

containers of the competing products are not confusingly similar but, on the contrary, readily distinguishable.

 That the defendants may profit, that they even formally desired and planned to profit, from the advertising of the plaintiff's product through many years, especially in the South, seems probable. But that is held not to be objectionable, in many cases of which a striking example follows: "Kellogg Company is undoubtedly sharing in the good will of the article known as 'Shredded Wheat'; and thus is sharing in a market which was created by the skill and judgment of plaintiff's predecessor and has been widely extended by vast expenditures in advertising persistently made. But that is not unfair. Sharing in the good will of an article unprotected by patent or trademark is the exercise of a right possessed by all—and in the free exercise of which the consuming public is deeply interested." Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 122, 59 S.Ct. 109, 115, 83 L.Ed. 73. The distinction seems to lie between sharing in the good will of a product which is lawful, and appropriating the good will of a producer which is not to be tolerated.

One asserted fact may be mentioned briefly. The plaintiff requested a finding of fact in the General Foods case to the effect that prior to the time when the defendant introduced Post's Raisin Bran upon the market the plaintiff's business had been increasing at a rate of approximately fifty per cent over the previous year, but that between the advent of competition late in April 1942 and the month of September 1942, the plaintiff's percentage of increase in business fell to approximately twelve and one-half per cent. The court has declined to make the finding, not because it is wholly unsupported by proof or because it is effectively disputed, but rather because it is not established in proper association with practical experience in seasonal fluctuations and the general surrounding circumstances and might readily lead to unanticipated and unfounded inferences. Commercially 1942 was a notoriously unstable year, and the element of sales volume could have undergone substantial recession or increase from a variety of causes quite unconnected with competition. Besides, evidence in the case discloses that in the plaintiff's desirable southern marketing area which was also the field of greatest competitive effort, seasonal factors influence sales in the dry cereal field.

 The plaintiff also insists that unfair competition is to be inferred from the adoption by the defendants of the several names of their respective products, and asserts that many other names effectively descriptive of the products were readily available—even obvious. Among these, it suggests, "40% Bran Flakes with Raisins", prefixed at the producers' option with their respective trademark names "Post's" and "Kellogg's". That the name suggested and perhaps several other names were available is true. But to the court, and for reasons already suggested, so, it seems, was "Raisin Bran", or any reasonable variation or adaptation of it. And that is the crux of the matter. If the names selected by the defendants were permissibly open to them, it lay within their discretion whether they would select them. The judgment in that respect was not a prerogative of the plaintiff.

The proceedings have received due consideration and upon the essential foundation of the plaintiff's claim the issues have been resolved against it. The court has concluded that the plaintiff's selected name Raisin-Bran is not a fanciful or arbitrary device, but is rather a fair and faithful description of its product especially in the light of the history of the bran cereal industry and the practice in identifying bran type foods as bran flakes or simply as bran; that the name is not susceptible of employment as a technical trademark or exclusive appropriation as a common law trademark; that the name has not acquired a secondary meaning within the definition of the law upon that question; that there is a failure of proof of unfair competition as against either defendant; and that the equities in the two cases are with the several defendants thereto and against the plaintiff.

The judgment of the court in each instance is, therefore, for the dismissal of the plaintiff's action with costs. Exceptions are allowed.