STEEM–ELECTRIC CORPORATION v. HERZFELD–PHILLIPSON CO. et al.

No. 7205.

Circuit Court of Appeals, Seventh Circuit.

Dec. 18, 1940.

Edward S. Rogers, E. H. Hallows, Chas. B. Cannon, and Geo. H. Wallace, all of Chicago, Ill., for appellant.

A. L. Morsell, Jr., C. B. Morsell, and W. H. Lieber, all of Milwaukee, Wis., for appellees.

Before EVANS, MAJOR, and KERNER, Circuit Judges.

MAJOR, Circuit Judge.

This suit was brought by Steem-Electric Corporation against Harry E. Bremer,

trading as H. E. Bremer Manufacturing Company, the Herzfeld-Phillipson Company, a corporation, Western Hardware and Specialty Company, a corporation, and Steam-O-Matic Corporation, to enjoin the infringement of Design Patent No. D-112,-129, the infringement of plaintiff's trade-mark "Steem-Electric" registered November 20, 1937, under the Trade-Mark Act of February 20, 1905, 15 U.S.C.A., §§ 81–109, and again April 25, 1939, under the Trade-Mark Act of 1920, 15 U.S.C.A. § 121 et seq., and for unfair competition.

■ Counsel for the plaintiff, at the conclusion of the hearing, conceded non-infringement of the design patent, and the court, by judgment, entered November 24, 1939, dismissed the complaint for want of equity. The appeal was taken from the order of dismissal as to all defendants except Bremer. The judgment of dismissal as to him is therefore not before us.

The product in suit, around which the charge of trade-mark infringement and unfair competition revolves, is a steam electric or electric steam iron, which, as the name indicates, is heated by electricity and generates steam from water contained in a chamber within the iron. This iron is thus distinguished from an electric iron heated by electricity, but which operates without steam, as well as the old-fashioned iron which receives its heat by contact with an outwardly hot object.

In plaintiff's first registered trade-mark, the words "Steem-Electric" are disclosed in combination with a design showing lightning flashes adjacent to the word "Electric" and a cloud of escaping steam adjacent to the word "Steem". In this registration appears this disclaimer: "No claim is made to the words 'Steem-Electric' apart from the mark." The second registration merely designated the words "Steem-Electric."

The plaintiff, about three years prior to the starting of suit, commenced and subsequently has been engaged in the manufacture and sale of household steam-electric irons under its trade-mark name of "Steem-Electric." The defendant, Steam-O-Matic Corporation, shortly thereafter, commenced and subsequently has been engaged in the manufacture and sale of a similar iron under its trade-name of "Steam-O-Matic." These irons are assembled for the defendant, Steam-O-Matic Corporation, by the defendant, Western Hardware and Specialty Manufacturing Company. The defendant, the Herzfeld-Phillipson Company (commonly known as the "Boston Store" in Milwaukee, Wisconsin), is a retail dealer selling the "Steam-O-Matic" iron. The controversy, therefore, is largely between the plaintiff and the Steam-O-Matic Corporation.

The essential issue in dispute is whether the plaintiff's trade-mark "Steem-Electric" has acquired a secondary meaning as indicating the plaintiff's product, and, if so, whether it is infringed by the defendant's trade-mark "Steam-O-Matic." A corollary to this issue is whether the defendants are guilty of unfair competition. As bearing upon the latter issue, the contention is made that the defendant, in the production of its iron, employs a stippled finish which is characteristic of the plaintiff's iron.

Plaintiff, in support of its position, relies largely upon Armstrong Paint & Varnish Works v. Nu-Enamel Corporation, 305 U. S. 315, 59 S.Ct. 191, 83 L.Ed. 195, affirming a decision of this court. 7 Cir., 95 F.2d 448. On the other hand, Steam-O-Matic Corporation (hereinafter referred to as the "defendant") places equal emphasis upon Kellogg Company v. National Biscuit Company, 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73. As might be expected, the plaintiff endeavors to distinguish the latter, and the defendant the former case. Before considering these authorities and others relied upon by the respective parties, it seems appropriate to give a brief resumé of the facts as they appear in the record.

■■ Many witnesses were heard, some in person and others by deposition, which evidence the plaintiff argues establishes without question, the secondary meaning of plaintiff's trade-mark, infringement by the defendant and unfair competition. It would unduly prolong our opinion to refer to such testimony in detail. As the defendant points out, all the testimony bearing upon these issues had to do with incidents occurring subsequent to the commencement of the suit. Also, the testimony came largely, if not entirely, from paid investigators employed by the plaintiff to obtain evidence, and from wholesale and retail dealers who were agents for the sale and distribution of plaintiff's iron. While, no doubt, testimony obtained subsequent to the commencement of the suit was properly admissible, yet we are of the opinion that its weight was, to some extent, impaired. Likewise not controlling, but of some significance, is the fact that not a single bona

fide customer for plaintiff's iron testified in behalf of the plaintiff.

The testimony of the wholesale dealers was largely to the effect that to them the trade-mark "Steem-Electric" designated an iron manufactured by the plaintiff. Typical of such testimony is that of the witness Stern, buyer for a department store of Hartford, Connecticut.

"Q. When you see the trade-name, Steem-Electric Iron, does it indicate any particular manufacturer to you? A. It definitely does. It indicates the make of irons manufactured by the Steem-Electric Corporation of St. Louis, Missouri."

Retail dealers gave similar testimony, and generally stated that in ordering plaintiff's iron, they designated it as "Steem-Electric." Typical of such testimony is that of the witness Thompson, buyer for a New York Department Store.

"Q. When you buy this product, what do you ask for? A. Steem-Electric Irons.

"Q. And why is that? A. That's what it is, so far as I know."

There is also testimony to the effect that when consumers wanted the plaintiff's product they called for "Steem-Electric" irons. Demonstrators at department stores testified that prospective customers inquired and talked about the "Steem-Electric" iron. A member of a team who had conducted a radio program for the plaintiff, testified to receiving 6000 letters referring to plaintiff's iron, and that ninety to ninety-five per cent of them spelled the word "steam" as "Steem."

Assuming that plaintiff's testimony in this respect furnishes some support for its contention that the trade-mark "Steem-Electric" carried a secondary meaning, it must be remembered that its dealers and agents, exclusively engaged in purchasing and selling its product, would naturally associate with plaintiff the product sold under its trade-name. It does not follow that the public or any considerable portion thereof would be thus impressed. It is also important to observe that many of plaintiff's witnesses—in fact, 26 out of 30— admitted, in effect, that the words "Steem-Electric" were descriptive of the product rather than the producer. Typical of such testimony is that of the witness Berman:

"Q. If you were going to specify a household electric steaming iron made by some company other than the Steem-Electric Corporation of St. Louis, Missouri, would you use the name 'Steem-Electric'? A. Yes.

"Q. In order to differentiate from the ordinary electric iron, of which you have thirty-five other makes, and when you are talking about one of the irons like the plaintiff's, it is almost necessary to use the word 'Steam' is it not? A. That's right."

Also, the witness Berstein:

"Q. Then wouldn't you say that an iron which is heated electrically, and which discharges steam must be designated as a steam electric iron to differentiate it from an ordinary non-steam electric iron? A. Yes."

It is not disputed but that prior to the time that plaintiff commenced the manufacture of its iron, there were a number of irons on the market electrically heated and steam generating. They were, as a class, commonly designated as the steam-electric, or electric-steam iron. A number of such irons were covered by patents, one of which, Kako Patent No. 1,347,224, entitled "Electric Steam Iron" expired prior to the time that plaintiff entered this field.

The first and foremost legal question presented is whether plaintiff's trade-mark "Steem-Electric" acquired a secondary meaning as indicating the plaintiff's product. The District Court in this respect made the following finding of fact [29 F. Supp. 1011, 1012]: "In view of the descriptiveness of plaintiff's mark, and in view of the prior and common uses of similar terms, as set forth in paragraph 12 above, plaintiff's alleged mark 'Steem Electric' cannot and has not acquired a 'secondary meaning.'"[1] In fact, plaintiff states that the present appeal is largely from this finding.

Before deciding this question, we refer to defendant's contention that the plaintiff is precluded from use of the mark "Steem-Electric" because of its unqualified disclaimer of such words in its first trade-mark registration. We do not think this argument is sound for the reason that the plaintiff has the common-law right to its trade-mark if otherwise valid, irrespective of registration. Armstrong Paint &

---

[1] Paragraph 12 cites a number of companies which have adopted and used the term "Steam Electric Iron" prior to the adoption of the term "Steem-Electric" by the plaintiff.

Varnish Co. v. Nu-Enamel Corporation, supra; United States Ozone Company et al. v. United States Ozone Company of America, 7 Cir., 62 F.2d 881, 885. If its right in this respect is not dependent upon registration, it would seem to follow that the disclaimer could not be utilized as an estoppel. At the same time, we think it is reasonable to assume that the reason for the disclaimer was recognition on the part of the plaintiff, and perhaps the patent office as well, that the disclaimed words were merely descriptive of a product in common use and, therefore, could not be protected by trade-mark. If this assumption is correct, the disclaimer is inconsistent with the plaintiff's present position and increases its burden in establishing the validity of its mark. In this connection, it is pertinent to point out that the defendant is only charged with infringement of the trade-mark "Steem-Electric," as there is no contention that it uses such words in connection with the electric flashes and clouded effect as shown in the plaintiff's first registration.

■ That the words "Steam-Electric" are descriptive as designating a product long in use and as manufactured and sold by many concerns, both prior and subsequent to the time of plaintiff's entry into this field, is forcibly demonstrated by this record. Can plaintiff, by changing one letter in the word "steam" so as to make it read "steem" make it any less descriptive? It is our view that the answer must be in the negative.

It would serve no useful purpose to attempt to review and distinguish what the courts have said in dealing with situations of this character. A study of such cases is rather convincing that each case must stand upon its own facts. At this point, however, we refer to Standard Paint Company v. Trinidad Asphalt Company, 220 U.S. 446, 31 S.Ct. 456, 55 L.Ed. 536. There the court held that the word "rubberoid" being a descriptive word, was none-the-less descriptive when spelled "ruberoid" and that the latter could not be appropriated as a trade-mark. The court used language pertinent to the instant situation, when, on page 455 of 220 U.S., on page 458 of 31 S.Ct., 55 L.Ed. 536, it said: "* * * The word, therefore, is descriptive, not indicative of the origin or the ownership of the goods; and, being of that quality, we cannot admit that it loses such quality and becomes arbitrary by being misspelled. Bad

orthography has not yet become so rare or so easily detected as to make a word the arbitrary sign of something else than its conventional meaning, as different, to bring the example to the present case, as the character of an article is from its origin or ownership."

It must not be overlooked, however, that while the court denied the effect of a trade-mark to a descriptive name, it was not considering a situation where such name had acquired a secondary meaning. This was pointed out in a footnote (305 U.S. page 335, 59 S.Ct. page 201, 83 L.Ed. page 207) in Armstrong Paint & Varnish Company v. Nu-Enamel Corporation, supra. In fact, the court in the latter case recognized plaintiff's trade-mark as descriptive of the product there in issue. So we think it must be concluded that the mere fact that a trade-name is descriptive is not sufficient to invalidate it.

■ Its validity depends upon whether it has acquired a secondary meaning—that is, if, in the minds of the public, it means the producer rather than the product. While it is not easy to distinguish some of the language employed in the Nu-Enamel case from Kellogg Company v. National Biscuit Company, supra, we are of the opinion that the basic distinction, and that which was largely determinative of the court's conclusion in the Nu-Enamel case, was the concession of the defendant that "Nu-Enamel" had acquired the meaning of the plaintiff's products and that it was a mark which distinguished such products from others of the same class. In the instant case, where no such concession was made, we must determine whether plaintiff has sustained the burden of establishing a secondary meaning for its trade-name. On this question, we think the Kellogg case comes near being conclusive. Plaintiff argues that the proof in the case at bar discloses a secondary meaning and that it is thus distinguishable from the Kellogg case. We do not believe this argument is tenable. In the Kellogg case, the court, on page 118, of 305 U.S., on page 113 of 59 S.Ct., 83 L.Ed. 73, said: "* * * There is no basis here for applying the doctrine of secondary meaning. The evidence shows only that due to the long period in which the plaintiff or its predecessor was the only manufacturer of the product, many people have come to associate the product, and as a consequence the name by which the product is generally known, with the

plaintiff's factory at Niagara Falls. But to establish a trade name in the term 'shredded wheat' the plaintiff must show more than a subordinate meaning which applies to it. It must show that the primary significance of the term in the minds of the consuming public is not the product but the producer. This it has not done. * *"

In the Kellogg case, the proof in this respect was more favorable to the plaintiff than here. There the name in controversy had been used by the plaintiff and its predecessor exclusively for many years, while here the name had only been used by plaintiff for a comparatively short time, and at the time of its adoption, was a common term. Here the amount spent in advertising plaintiff's trade-name was infinitesimal in comparison with that expended in the Kellogg case. In the instant case, the most that can be said for plaintiff's proof is that its trade-name carries a "subordinate meaning" in the minds of the consuming public, rather than one of "primary significance". In fact, as already pointed out, the record is barren of evidence coming from the consuming public as to its reaction in relation to plaintiff's trade-name.

Also, in the Kellogg case, the court stressed the fact that plaintiff's patent, upon the product to which the term in dispute applied, had expired, and that, thereupon, there passed to the public the right to make the article as well as the right to apply thereto the name by which the article had become known. A somewhat similar situation is presented here. As already pointed out, at least one patent upon a steam-electric iron had expired. With such expiration the monopoly ceased, and any member of the public had a right to manufacture and sell, not only the product covered by the patent, but under the name by which it was therein described.

The court below found that plaintiff's trade-mark "can not and has not acquired a secondary meaning." There is no occasion for us to decide the possibility of such acquirement. It is sufficient to conclude that it has not, and to that extent, we approve of the court's finding.

Furthermore, we are of the opinion that even though plaintiff has a valid trade-mark, it has not been infringed by the defendant. Defendant's trade-name, "Steam-O-Matic", is readily distinguishable from the term "Steem-Electric" both when written and spoken. It is difficult to believe that the public, assuming that its sensibilities are so keen as to recognize a "Steem-Electric" iron as being the product of the plaintiff, would not, at the same time, recognize a "Steam-O-Matic" iron as coming from a different source. To hold that the defendant is precluded from the use of the word "steam" in its trade-name is to say that it can not use a generic word descriptive of its product.

Plaintiff points to the confusion occasioned by the alleged similarity of defendant's trade-name. There is some proof in this respect, but it does not follow that it was the result of the name employed by the defendant. In fact, we are of the opinion that such confusion as was shown was the result of the adoption by the plaintiff of a term, not only descriptive of its product, but one long employed by the public in describing the same product manufactured and sold by others.

Plaintiff, as we understand its argument, also claims that it is entitled to prevail on the grounds of unfair competition, and this, irrespective of the validity of its trade-mark or infringement thereof. While unfair competition, no doubt, may exist independently of trade-mark infringement, yet "the facts supporting a suit for infringement and one for unfair competition are substantially the same." Armstrong Paint & Varnish Co. v. Nu-Enamel Corporation, supra [305 U.S. 315, 59 S.Ct. 196, 83 L.Ed. 195]. There is, however, some testimony in the instant case which has a bearing upon the charge of unfair competition, which we do not think is material to the infringement issue. A number of witnesses gave testimony to the effect that the stippled finish on the plaintiff's iron distinguished it from other irons, and plays a material part in its identification by the public. In our view, plaintiff's position in this respect is without merit. As already stated, in the beginning this suit charged the defendants named in the complaint with infringement of a certain design patent issued to Ernest F. Pohl. The court below found with reference to this patent: "The design, as shown and claimed in Pohl patent in suit No. D-112,-129, was invented by the defendant Harry Bremer, and Ernest F. Pohl."

Ernest F. Pohl, President of the plaintiff corporation, assigned this patent to the corporation. The defendant, in the court below, as here, urged that the complaint be dismissed on the ground that the

plaintiff was in court with unclean hands. The contention as made there, and pressed here, was that Pohl, in obtaining this patent, knowingly made a false affidavit that he was the sole inventor, when, as a matter of fact, the invention was that of Harry E. Bremer. We have studied the testimony bearing upon this issue and are of the opinion that the District Court dealt charitably with Pohl in giving him credit as a joint inventor. It is possible, however, that he might have been innocently mistaken, and we therefore conclude that the defense of unclean hands should not prevail.

Accepting the situation as found, it is difficult to see how plaintiff is entitled to exclusive rights in the so-called stippled finish. This stippled or hammered finish was common on aluminum castings and had been used extensively on various kinds of kitchen wares. Bremer had long used it, and in the design patent the stippled finish is shown—in fact, it is the most distinguishing feature of the design. Bremer, for some time, was employed by the plaintiff in the production of this stippled-finished product used in connection with its iron. For some reason not material, Bremer severed his connection with the plaintiff and commenced supplying the stippled product to the defendant, Western Hardware and Specialty Company, associated with the defendant, Steam-O-Matic Corporation, in the manufacture and assembly of its iron. Under such circumstances, it is not strange that plaintiff conceded non-infringement of the design patent and failed to appeal from the order dismissing its complaint as to Bremer. It appears there could be no question but that Bremer, as a joint inventor, had equal rights with the plaintiff as to the design disclosed by the patent. It would seem to be axiomatic that in utilizing that design, he could not be successfully charged with unfair competition, and certainly not infringement. His rights in this respect, however, would be futile unless he could manufacture and sell the stipple-finished metal. If Bremer had this right, which we think he did, it must follow that the defendants who purchased such metal from him, would not be liable for unfair competition by its use.

We therefore conclude that the defendant has the right to manufacture and sell its iron under the trade-name employed, and with the stippled finish. Under the Kellogg case, however (pages 118, 119 and 120 of 305 U.S., 59 S.Ct. 109, 83 L.Ed. 73), it appears that this right is limited by its obligation to use reasonable care to inform the public as to the identity of its product. The testimony supports the following finding: "* * * The plaintiff's iron is much heavier than defendants' iron; there is a marked difference in the shape and appearance of the two irons; plaintiff's iron is sold in a predominantly red carton; defendants' iron is sold in a plain craft package with blue lettering. Defendants, in their advertising on the cartons and otherwise, do not use anything resembling plaintiff's cloud effect and lightning flashes."

Plaintiff's iron, as well as defendants', together with the respective cartons in which they are packed and sold, are here as physical exhibits. An inspection discloses no similarity between the cartons and it appears that the irons are as dissimilar in size, shape, weight and design as could be expected, considering the fact that all irons, so far as we are aware, have a similarity common to that product. We are of the opinion that the defendant exercised reasonable care so that its product would not be palmed off on the public as that of the plaintiff.

It is our view that the District Court was not in error in dismissing plaintiff's complaint, and its judgment is affirmed.