TRIANGLE PUBLICATIONS, Inc., v. ROHRLICH et al.

ROSENBAUM et al. v. TRIANGLE PUBLICATIONS, Inc.

Nos. 52, 53, Dockets 20682, 20683.

Circuit Court of Appeals, Second Circuit.
April 14, 1948.

Rehearing Denied May 6, 1948.

FRANK, Circuit Judge, dissenting.

———◆———

Lord, Day & Lord, of New York City (Herbert Brownell, Jr., and Woodson D. Scott, both of New York City, and Murdoch, Paxson, Kalish & Dilworth and Richardson Dilworth, all of Philadelphia, Pa., of counsel), for plaintiff-appellee and cross-appellant in first action, and defendant-appellee in second action.

Pennie, Edmonds, Morton & Barrows, of New York City (George E. Middleton and William M. Pollack, both of New York City, of counsel), for defendants-appellants in first action and for plaintiffs-appellants in second action.

Before AUGUSTUS N. HAND, CLARK and FRANK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The plaintiff, Triangle Publications, Inc., a Delaware corporation, has published since September 1944 a girls' magazine entitled "Seventeen," for which a trade-mark registration was granted to plaintiff on January 9, 1945, for a "monthly magazine devoted to the interests of girls." In February 1945, the defendants, citizens of New York, adopted "Miss Seventeen Foundations Co." as a partnership name under which to make and sell girdles, and "Miss Seventeen" as the trade-mark for those girdles. They applied for registration of "Miss Seventeen" as a trade-mark for such girdles on June 28, 1945.

Early in 1946 the plaintiff began to write letters to some of defendants' customers charging them with trade-mark infringement and stating that if they did not discontinue the use of the mark "Seventeen" it would institute suit to enjoin its further use by them and to recover damages. Believing this claim to be unwarranted, the defendants brought an action in the Supreme Court of New York to restrain such interference with their business. The plaintiff removed the action to the District Court for the Southern District of New York and instituted an action of its own for infringement of its registered trade-mark and unfair competition by the use of "Seventeen" on defendants' girdles. It at the same time interposed counterclaims in the removed action which are substantially identical with the complaint in its own action. The two suits were consolidated for trial. Howard Strumpf, listed as a party-defendant in the action by Triangle Publications, Inc., was not served with process and did not appear. In the present opinion we shall call Triangle Publications, Inc., plaintiff and Miss Seventeen Foundations Co., defendant.

The District Court was of the opinion that magazines and girdles were not goods

of the same descriptive properties and reached the conclusion that therefore defendants were not "guilty of statutory trade-mark infringement," but it determined that the defendants were guilty of "unfair competition and unfair trading entitling plaintiff to relief." It accordingly entered a judgment granting a permanent injunction against the further use by defendants of the word "Seventeen" or the numeral "17" and ordering an accounting of all defendants' profits realized in the sale of girdles under this trade-mark subsequent to October 4, 1945. It also entered a judgment dismissing the defendants' action.

The plaintiff has appealed from so much of the judgment in its own action as failed to order an accounting of profits from the time the defendants originally commenced doing business as "Miss Seventeen Foundations Co." until October 4, 1945. The defendants have appealed from the judgments in both actions.

The judge found that from September 1944, when the plaintiff first published its magazine "Seventeen" for girls thirteen to eighteen years of age, the magazine became an important medium for advertising teen-age apparel and accessories, and that by January 1945 a large proportion of the users of teen-age apparel had acquired a belief that articles, including girdles, advertised in or mentioned editorially by the magazine had an added desirability. He found further that by January 1945 the use of "Seventeen" to describe any article of teen-age apparel, including girdles, was likely to create the belief in the mind of teen-age girls that the article was advertised in or commented upon editorially by the magazine, and that the use of "Seventeen" as a trade-mark or trade name by a manufacturer of teen-age apparel was likely to cause damage to plaintiff's goodwill in the name of its teen-age fashion magazine. The judge also determined that "Seventeen" as the title of the magazine was a valid trade-mark in that it was arbitrary and fanciful and not descriptive of the magazine or its subject-matter and that it almost immediately acquired a secondary meaning. With regard to defendants' choice of the name "Miss Seventeen" for

their girdles, the judge found that when they decided to use and did use "Seventeen" as part of the trade name they knew of the existence and nature of plaintiff's magazine and of its success in the teen-age fashion field. He found that "Seventeen" was a desirable name for the defendants because purchasers would have the erroneous belief that the girdles had been editorially approved by or advertised in the magazine and that this belief would aid their sales, and also that in advertising they placed primary emphasis upon the words "Miss Seventeen" and their retailers naturally tended to stress the word "Seventeen."

The judge further found that "Seventeen" was successful as a teen-age fashion magazine, as indicated by the large and rapid increases in its circulation, size, and advertising lineage and rates. He also held that it had played an important part in the merchandising of teen-age apparel in various ways, such as by conferences with manufacturers, editorial fashion comments, sales to manufacturers and merchandisers of reprints, counter-cards and blow ups of its comments and of advertising, monthly bulletins advising merchandisers how to tie in with forthcoming issues of the magazine, and by aiding merchandisers in arranging window displays and departmental displays. All this would seem to make it clear that the public was likely to attribute the use of "Seventeen" in connection with sales of teen-age merchandise to the plaintiff as a source of sponsorship.

Inasmuch as we think that the injunction granted by the decree was proper and that the court rightly sustained the charge of unfair competition as a basis for it, we need not determine whether there was an infringement of the registered trade-mark. But whether the defendants infringed a registered trade-mark or were guilty of unfair competition, we do not believe that an accounting should have been ordered.

The Eighth Circuit in Hanson v. Triangle Publications, 163 F.2d 74, upheld an injunction granted to the same company which is the plaintiff in the case at bar, enjoining Hanson and another, manufacturers of dresses for teen-age girls labeled

"Seventeen for the Junior Teens," from using the word "Seventeen" in the manufacture, sale, distribution and advertising of such dresses. The court placed its decision upon a holding of unfair competition rather than upon infringement of the registered trade-mark for the reason that the trade-mark of Triangle Publications, though found to be fanciful and arbitrary, was considered as not being used upon "merchandise of substantially the same descriptive properties" as defendants. It also affirmed the trial court's denial of an accounting because there was no proof that the plaintiff therein had sustained any loss directly or indirectly. Upon facts that were without any significant difference from those in the case before us, the Eighth Circuit held that the defendants' use of "Seventeen" created a likelihood that the public would erroneously believe that defendants' dresses were advertised in or sponsored by the magazine and that the plaintiff's reputation and good will would thereby be injured. For this reason the plaintiff was held entitled to protection from such use of the misleading term. Judge Woodrough filed a dissenting opinion in which he expressed the view that "Seventeen" was a word of mere description which had acquired no secondary meaning. This was in effect a dissent upon the facts from the decision of the majority of his court and was in contradiction of the findings of the court below. The Supreme Court denied a petition for a writ of certiorari in the foregoing suit. 332 U.S. 855, 68 S.Ct. 387.

We are in accord with the views of the district judge and the Eighth Circuit that plaintiff's use of "Seventeen" was arbitrary and fanciful rather than descriptive of the magazine or its subject matter. In other words, it was employed as symbolical of teen-age girls and their interests rather than in any primary or literal sense. In the record before us there was substantial evidence to support the findings of the district court that the word "Seventeen" as used by the plaintiff had almost immediately acquired a secondary meaning and that the defendants' use of that word was likely to cause a confusion as to sponsorship by plaintiff that might be harmful to the latter's reputation. This is particularly shown by the testimony of qualified witnesses who were in the merchandising business, the tie-ins of the magazine with manufacturers and retailers noted above, and by the great number of its subscribers and advertisers. The district judge's finding that defendants deliberately chose their name in order to take advantage of the likelihood of confusion with plaintiff's magazine and the attribution of some of their sales to its sponsorship was supported by the evidence and involved questions of credibility for his determination. This selection of the word "Seventeen" by the defendants with such an intent was in itself evidence that there would be a likelihood of confusion and that such confusion would work to their advantage. Such a prospective gain to the defendants, which apparently caused them to make use of the word "Seventeen," would necessarily be at the risk of the plaintiff's reputation and the realization of it through the erroneously supposed sponsorship of the plaintiff would injure the latter's reputation if goods sold by the defendants were inferior to the high quality which the public attributed to the goods actually advertised in or commented upon by the magazine. We agree with the holding of the Eighth Circuit that the defendants cannot lawfully impose any such risk upon the plaintiff by appropriating its name "Seventeen" because that name had come to indicate in the teen-age fashion field a sponsorship by or some relation to the magazine.

It is settled law that a plaintiff who has established a right to a trade name which is fanciful or arbitrary or has acquired a secondary meaning is entitled to protection of his reputation against the use of that name by others even upon non-competing goods, if the defendant's goods are likely to be thought to originate with the plaintiff. Yale Electric Corporation v. Robertson, 2 Cir., 26 F.2d 972; L. E. Waterman Co. v. Gordon, 2 Cir., 72 F.2d 272; Standard Brands v. Smidler, 2 Cir., 151 F. 2d 34; Bulova Watch Co. v. Stolzberg, D. C. Mass., 69 F.Supp. 543; Restatement, Torts, § 730. We can see no reason why the principle laid down by the foregoing decisions does not apply to the situation of

confusion as to sponsorship found by the district judge to exist in the record before us. In either case, the wrong of the defendant consisted in imposing upon the plaintiff a risk that the defendant's goods would be associated by the public with the plaintiff, and it can make no difference whether that association is based upon attributing defendant's goods to plaintiff or to a sponsorship by the latter when it has been determined that plaintiff had a right to protection of its trade name. In each case the plaintiff is likely to suffer injury to his reputation and his trade name. Indeed, we have already applied this principle in a case involving sponsorship or approval of goods by the Boy Scouts of America in Adolph Kastor & Bros. v. Federal Trade Commission, 2 Cir., 138 F.2d 824. See also Esquire, Inc. v. Esquire Bar, D. C. S. D. Fla., 37 F.Supp. 875 where the use of the name of the magazine "Esquire" was enjoined.

Two decisions upon which the defendants rely are Durable Toy & Novelty Corp. v. J. Chein & Co., 2 Cir., 133 F.2d 853, and Vogue Co. v. Thompson-Hudson Co., 6 Cir., 300 F. 509; Vogue Co. v. Vogue Hat Co., 6 Cir., 6 F.2d 875, certiorari denied Thompson v. Vogue Co., 273 U.S. 706, 47 S.Ct. 98, 71 L.Ed. 850. In the first case we declined to enjoin the use of the name "Uncle Sam" in connection with toy banks. In weighing the conflicting interests there, it was thought that "Uncle Sam" represented a common name or symbol of national solidarity, was a part of the national mythology in the use of which all had a measurable interest and was therefore not subject to sole appropriation by any individual. It was also thought that the name was most unlikely to have acquired any secondary meaning to customers in stores. In the case at bar the name "Seventeen" as applied to plaintiff's magazine was not used in a descriptive sense and was properly held arbitrary and fanciful. The defendants made use of the word as referring to the magazine rather than for some legitimate purpose, as was done in Durable Toy & Novelty Corp. v. J. Chein & Co., supra. In the Vogue case, an injunction was at first denied as to use of the name of the magazine because the word "Vogue" was held to be descriptive and to have acquired no secondary meaning, though an injunction against the use of that name was later granted because of the fraud in defendant's appropriation of plaintiff's insignia, the use of which had been originally enjoined. We think the facts are thus plainly distinguishable from those in the case at bar. Similarly, a reading of the opinions in other cases cited by defendants shows that they invoke no different principle of law but are distinguishable on their facts, because they involve merely descriptive names or names which had acquired no secondary meaning that extended into defendant's field so as to cause a likelihood of confusion.

■ Defendants argue that plaintiff's use of the trade name "Seventeen" subsequent to the use of that term by a company named Juerelle, Inc., upon cosmetics tends to cause more confusion than does the word as applied to girdles, for the reason that the cosmetic field is larger and represents a more general interest on the part of teen-age girls. It may be that some confusion was caused in the cosmetic field in view of the protest by Juerelle, Inc., against the use of tags furnished by the plaintiff to cosmetic companies which advertised in plaintiff's magazine and competed with Juerelle, Inc. But the use of these tags was thereupon abandoned by the plaintiff and so far as the record indicates there was no subsequent objection by this company to the use by the plaintiff of the trade name "Seventeen." In any event, this prior use of "Seventeen" in the cosmetic field has no bearing on the issues before us and would not destroy the value of the name which the plaintiff has built up for its magazine in the apparel field or provide any defense for defendants' subsequent acts of unfair competition. Del Monte Special Food Co. v. California Packing Corp., 9 Cir., 34 F.2d 774; Restatement, Torts, § 717g. Such was the holding of the court below and of Judge Duncan who rendered the decree, afterwards affirmed by the Eighth Circuit, in Triangle Publications v. Hanson, D. C. E. D. Mo., 65 F.Supp. 952.

■ The trial court allowed an accounting of defendants' profits, but Tri-

angle Publications itself has sold no goods which were in competition with defendants so there is no basis here for awarding profits as an equitable measure of a loss sustained by plaintiff. Vogue Co. v. Thompson-Hudson Co., supra; Durable Toy & Novelty Corp. v. J. Chein & Co., supra; Esquire, Inc v. Esquire Bar, supra; Restatement, Torts, § 747. The cases relied upon by plaintiff for an accounting involved parties selling competing goods and are therefore no authority for allowing an accounting in the present case. Moreover, there is no evidence that any direct or indirect injury has been caused by defendants to the plaintiff's business or good will. Such was the conclusion of the Eighth Circuit in Hanson v. Triangle Publications, supra. This denial of an accounting would follow even if we were to rest our decision upon an infringement of plaintiff's trade-mark which we find unnecessary to do. Cf. Vogue Co. v. Thompson-Hudson Co., supra. The plaintiff further relies as a justification for an accounting upon the Lanham Act, Trade Mark Act of 1946, effective July 5, 1947. 15 U.S. C.A. § 1051 et seq. We cannot see that this Act affords plaintiff any new rights to an accounting; Section 35 of the Act relating to an accounting merely states that an accounting shall be given "subject to the principles of equity." 15 U.S.C.A. § 1117.

The judgment in the action by Triangle Publications, Inc. is modified so as to dispense with the direction for an accounting, but is otherwise affirmed; the judgment dismissing the action brought by Helen E. Rosenbaum et al., is affirmed.

FRANK, Circuit Judge (dissenting).

With admirable candor, the trial judge said, in his opinion, that "plaintiff's claim to protection" is "the farthest that the courts have been asked to extend the reach" of the unfair competition trade-name doctrine. Indeed it is. Even in cases where there is potential (not presently existing) competition, the courts today, when they grant relief, do so most cautiously.[1] When they do, it is because of actual or probable "confusion of source" which may injure the plaintiff's reputation, for the "free-ride" theory is today discredited.[2] In the instant case, there is not even potential competition. For the defendants, as sellers of girdles, do not compete with plaintiff, which makes and sells nothing but a magazine, and which does not so much as intimate that it contemplates ever making or selling anything else. Moreover, as I shall try to show,[2a] the positive proof is that plaintiff has not sustained, and is not likely to sustain, any actionable loss resulting from defendants' conduct. Yet, as plaintiff requested, the trial judge extended the trade-name doctrine, although he conceded that none of the questions of fact was "free from doubt," and confessed to "some misgivings as to any public benefit from the development of such advertising media as the plaintiff's magazine." In affirming the decree, I think my colleagues have made some vital mistakes both as to crucial facts and legal principles. I think, too, that the Supreme Court ought to review this decision, because (as I shall try to show) it is at odds with a decision of the Sixth Circuit, and also with the rationale of recent decisions of this court (thus leaving the subject in confusion in this circuit).

1. The principal prop of my colleagues' decision is their conclusion, repeatedly stated, that the name "Seventeen" is not descriptive but fanciful. Where a trade-name is merely descriptive, of course there is a much heavier burden upon one claiming exclusive use. I think that the history (not mentioned by my colleagues) of plaintiff's adoption of that name unmistakably demonstrates that it is descriptive:

(a) The uncontradicted testimony is that, in the Spring of 1944, that name was suggested to the magazine's founders because it "symbolized all that a teen-age magazine should stand for," namely "the idea of youth." The editor-in-chief of plaintiff's magazine testified that she had recommended the name to plaintiff's executive because "the name epitomizes the very spirit of the group of girls I hope to reach." In other words, the founders of this magazine believed that "Seventeen" meant "youth" to

---

[1] See discussion, infra, point 6.
[2] See discussion, infra, point 4.
[2a] See discussion, infra, point 7.

the general public before plaintiff used that word, and that is why plaintiff chose that name.

(b) Accordingly, before the magazine made its first appearance, plaintiff's president, Annenberg, wrote to Booth Tarkington, author of the well-known novel, "Seventeen," a book which dealt with adolescents and which had popularized that word as a symbol of adolescence. In this letter, Annenberg, asking for Tarkington's "blessing" of the new publication, said that his staff "would like to call the magazine 'Seventeen' because this would represent the mean age group to which the magazine would appeal." Here surely, is convincing evidence that plaintiff itself thought the name had a well-established popular descriptive meaning, and that plaintiff intended to use the name to convey that and no other meaning.

(c) From 1928 to the present time—including the year in which plaintiff first used the name—"Seventeen" had been extensively employed and extensively advertised by others as the name of divers cosmetics to symbolize youth. Thus, on November 11, 1936, eight years before plaintiff first published its magazine, an article by a writer of a woman's page in a New York newspaper, said: "Far as we know, the only store which has a complete line of cosmetics frankly for young girls is R. H. Macy, whose creams, lotions, tonics, lipstick and perfume *for the gay little snip of a girl in her teens are fittingly called 'Seventeen.'* " [3] Before defendants adopted the name in 1944, it had been registered several times in the Patent Office by cosmetic companies, once as the name of perfumes and toilet-water, once as that of a toilet-soap, and once as that of cleansing-creams and the like.

In this connection, it should be observed that, in the May 1946 issue of plaintiff's magazine, approximately 20% of the commodities advertised are cosmetics of that sort. Yet, in spite of the frequent and widespread earlier use of that symbol by sellers of cosmetics, plaintiff, in effect, asserts that any such product may not be so labeled without its approval since other-wise consumers will erroneously believe that it has plaintiff's "sponsorship."

*The foregoing evidence so impressed the trial judge that he made the following finding of fact: "Seventeen epitomizes the spirit of youth. It was so used by the plaintiff, although the plaintiff was not the first, either in the literary or commercial field, to recognize and use this symbolic meaning of seventeen."*

2. The case is, then, I think, not as my colleagues depict it. Instead, we see that plaintiff adopted the name to mean precisely what it already meant to the consuming public. It is just as if (a) the plaintiff had called its magazine "Youth" and (b) the defendant were selling "Youth Girdles." Plainly, defendant should not be enjoined unless plaintiff, by its prior efforts, had established a "secondary meaning" of the name as applied to commodities such as girdles; for, of course, it is well settled that, without creating a "secondary meaning" one who first uses a descriptive name acquires no monopoly in the use of that name.

Our problem, then, in effect is this: Does the owner of a periodical, of wide circulation, called "Youth," which contains advertisements and editorial comments on wearing apparel or other articles for sale to girls, by the publication, advertising and merchandising "tie-ins" of such a periodical, establish "title" to a "secondary meaning" of that word so that the magazine-owner is entitled to an injunction against a defendant who later sells girdles under the name "Youth"?

Heretofore, the "secondary-meaning" doctrine has been restricted to cases where the defendant sells an article similar to, and actually or potentially competitive with, plaintiff's. Since, however, plaintiff's "secondary meaning" relates solely to a magazine, and defendants sell, not a magazine, but an article of wearing apparel, confusion, on the face of the matter, is most improbable. I think no buyer of "Youth" girdles would believe them in any way related to "Youth," a magazine. For the same reason, I see no probability of confusion here.

---

[3] Italics added.

Of course, that conclusion would have to yield, were there here a finding, supported by evidence, of actual confusion or clear evidence that it is likely. In that respect, the facts of Hanson v. Triangle Publications, 8 Cir., 163 F.2d 74, differ strikingly from this case. In the Hanson case, as appears from the opinion at page 78 of 163 F.2d the trial court had made an explicit finding of fact that "persons in the fashion and apparel business *had in fact been confused* into believing that there was some relation between defendants' dresses and plaintiff's magazine."[4] But here the trial judge made no such finding. He merely found (1) that articles advertised in, or editorially mentioned in, plaintiff's magazine attained an "added desirability" in the minds "of a large proportion of the teen-age apparel-users," and (2) that "the use of the name Seventeen to describe any article of teen-age apparel was likely to create the belief that the article of apparel was advertised in, or commented upon editorially by, the magazine." As we said in Best & Co., Inc. v. Miller, 2 Cir., 167 F.2d 374, "While not conclusive, it is not without significance in determining the likelihood of deception of the public by the use of the defendant's trade name, that no actual confusion has ever resulted. * * *"[5]

Absent a finding that the descriptive, non-fanciful, name "Seventeen," applied to such an article of apparel, created an actual belief in the fact that it had been thus advertised or editorially commented upon, the judge's finding as to what was "likely" is nothing but a surmise, a conjecture, a guess. We are not bound by such a finding. See United States v. United States Gypsum Co., 68 S.Ct. 525; Best & Co., Inc. v. Miller, supra. We can guess as well as the trial judge.

I think that we should not pioneer in amplifying the trade-name doctrine on the basis of the shaky kind of guess in which the trial judge indulged. Like the trial judge's, our surmise must here rest on "judicial notice." As neither the trial judge nor any member of this court is (or resembles) a teen-age girl or the mother or sister of such a girl, our judicial notice apparatus will not work well unless we feed it with information directly obtained from "teen-agers" or from their female relatives accustomed to shop for them. Competently to inform ourselves, we should have a staff of investigators like those supplied to administrative agencies. As we have no such staff, I have questioned some adolescent girls and their mothers and sisters, persons I have chosen at random.[6] I have been told uniformly by my questionees that no one could reasonably believe that any relation existed between plaintiff's magazine and defendants' girdles.

I admit that my method of obtaining such data is not satisfactory. But it does serve better than anything in this record to illuminate the pivotal fact. It convinces me that the plaintiff should bear a very heavy burden of proving that confusion is likely, a burden plaintiff did not discharge. For instance, plaintiff or the trial judge might have utilized, but did not, "laboratory" tests, of a sort now familiar,[6a] to ascertain whether numer-

---

[4] Emphasis added.
What was the evidence to support this finding, the Eighth Circuit's opinion does not disclose.

[5] See also Lucien Lelong, Inc. v. Lander Co., 2 Cir., 164 F.2d 395, 397.

[6] As I have said elsewhere: "Absent evidence of actual confusion, a determination of likelihood of confusion must come from judicial notice. In invoking judicial notice in this field, a judge's personal reactions may serve as some guide to the reactions of others." General Time Instrument Corp. v. United States Time Corp., 2 Cir., 165 F.2d 853, 856, dissenting opinion. See also People v. Mayes, 113 Cal. 618, 45 P. 860, 862; Rogers v. Cady, 104 Cal. 288, 38 P. 81, 43 Am.St.Rep. 100; Village of Catlin v. Tilton, 281 Ill. 601, 117 N.E. 999; 31 C.J.S., Evidence, § 12. Cf. Rome Ry. & Light Co. v. Keel, 3 Ga.App. 769, 60 S.E. 468.

[6a] See Burtt, Legal Psychology (1931) Chapter 20; Borden, Determination of Confusion in Trade-Mark Conflict Cases (23 Harv. Grad. School of Bus. Admin., No. 8, Dec. 1936, pp. 3-6); National Fruit Products Co. v. Dwinell-Wright Co., D.C., 47 F.Supp. 499, 508, affirmed, 1 Cir., 140 F.2d 618.

ous girls and women, seeing both plaintiff's magazine and defendants' advertisements, would believe them to be in some way associated.

3. To sustain his surmise as to probable confusion, the trial judge relied, for circumstantial evidence, exclusively on one part of the testimony; my colleagues ignore that testimony but turn to another part of the testimony on which the trial judge did not rely.

(a) The evidence to which the trial judge resorted is this: Plaintiff called as witnesses four girls, three of "teen-age," whom plaintiff had sent out to buy Miss Seventeen Foundation Girdles (i. e., defendants' product). Under instructions from plaintiff, each of these girls, before making a purchase, asked the sales clerk whether there was any connection between those girdles and Seventeen magazine. In each instance, the clerk, perceiving from the question that an affirmative answer would help to bring about a sale, gave that answer. Had the question been "slanted" towards a negative answer, doubtless such an answer would have been given.[7] Plaintiff paid these witnesses for their investigations and for testifying.[7a] I think this testimony is valueless, as my colleagues' silence concerning it indicates. If that testimony could prove anything, it would prove far more than likelihood of confusion; it would prove actual confusion on the part of the clerks.[8] But the trial judge did not rely on the testimony to find that any actual confusion had occurred. Instead, he stated, somewhat defensively, in his "Conclusions of Law" that "it is unnecessary to show that any persons have been deceived or confused by defendants' conduct." Though a finding of actual confusion would have strongly supported his conclusion, he carefully restricted his inference from that testimony to a finding of likelihood.

(b) My colleagues lean on the testimony of persons, called by plaintiff and described by my colleagues as "qualified witnesses who were in the merchandising business," testimony which the trial judge, when he admitted it, characterized as of little weight. These witnesses were sales managers or advertising agents. No one of them testified to any actual instance of confusion, but each, in response to plaintiff's questions, said that, in his opinion, customers would be likely to think that plaintiff sponsored defendants' girdles. An advertising agent called as a witness by defendants gave an opposing opinion. Even Callman, an enthusiastic supporter of trade-name monopolies, in his book, Unfair Competition and Trade Names (pp. 1278–79), acknowledges, as follows, that such testimony of such so-called "experts" should be accorded no respect: "It would be of no probative value to obtain from a witness an answer to the question: Is the defendant's trademark likely to deceive the public? The court must exercise its own judgment after a careful and astute comparison of the marks. The testimony offered by witnesses produced by the litigants, in such proceedings, has been thus characterized by no less an authority than the Supreme Court of the United States: 'Whatever may be their merit, they are not testimony in the proper sense of the word, being rather the expression of the opinion of the witnesses than substantive proof of existing facts. And the testimony of this character in favor of the respective parties, if allowed all possible weight, produces no affirmative result, since it is equally as strong by way of opinion on one side as it is upon the other.' Singer Mfg. Co., v. June Mfg. Co., 163 U.S. 169, 178, 16 S.Ct. 1002, 41 L.Ed. 118."

---

[7] Those engaged in polling public opinion have learned the unreliability of answers to questions which are thus slanted.

[7a] As to the slight weight to be attached to the testimony of paid investigators, see, e.g., Steem-Electric Corp. v. Herzfeld-Phillipson Co., 7 Cir., 118 F.2d 122, 124; Hostetter v. Bower, C.C., 74 F. 235; Soft-Lite Lens Co. v. Optical Service Co., Mo.App., 133 S.W.2d 1078, 1084.

[8] It could prove no confusion on the part of the purchasers, as they knew from their instructions that there was no connection between the girdles and the magazine.

I cannot believe it proper judicially to deprive defendants of their business, built around the name "Seventeen," because of such testimony. See Payton & Co. v. Lampard Snelling Co. [1901], A.C. 308, 311; Yale & Towne Mfg. Co. v. Alder 2 Cir., 154 F. 37, 38.

4. Perhaps because my colleagues sense the weakness of that testimony they advance another reason for their conclusion. They make much of the trial judge's statement that defendants took the name Seventeen "because they saw some advantage to it, brought to their attention by plaintiff's use of it." Defendants chose and used the name when plaintiff's magazine had been published for only some five months, but the judge concluded, despite defendants' denial, that defandants must have known of the magazine. My colleagues hold that this fact alone suffices to prove likelihood of confusion.

There I think my colleagues misapply a correct doctrine: (a) It has been held that, in a case relating to competitive articles, where there is room for a reasonable belief that confusion of buyers might occur (i.e., where that fact on the face of things is within the realm of the plausible), then evidence that defendants knowingly selected plaintiff's trade-name, with the deliberate intention of benefiting by plaintiff's public exploitation of it, is enough to prove that confusion is likely. (b) But such rulings have never been made—in truth, they have been rejected—when, as here, the probability of confusion of source is so slight as to be virtually incredible.

To illustrate: Suppose that a candy merchant made and sold candy called "Cadillac." No one would think that that candy was made or sponsored by the manufacturer of the Cadillac automobile. Nor would the automobile manufacturer be entitled to an injunction against the candy-maker merely because the latter deliberately chose the name, intending to acquire the advantages accruing to him from the elaborate advertising of the Cadillac.[9] Where, in such a case, the probability of confusion of source is not otherwise proved, evidence of such an intention is irrelevant. In such circumstances, the fact of a "free ride" is immaterial. Judge Wyzanski has referred to the "now discredited theory" of the "free ride."[10] Indeed, a "free ride," without more, is in line with the theory of competition. As Brandeis, J., said in Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 122, 59 S.Ct. 109, 115, 83 L. Ed. 73, "Sharing in the goodwill of an article unprotected by patent or trade-mark is the exercise of a right possessed by all—and in the free exercise of which the consuming public is deeply interested." As we said (per L. Hand) in S. C. Johnson & Son v. Johnson, 2 Cir., 116 F.2d 427, 429: "There is always the danger that we may be merely granting a monopoly, based upon the notion that by advertising one can obtain some 'property' in a name. We are nearly sure to go astray in any phase of the whole subject, as soon as we lose sight of the underlying principle that the wrong involved is diverting trade from the first user by misleading customers who mean to deal with him."

The courts have often held that, even when a defendant has the deliberate purpose to "palm off" his goods as those of another, he has done nothing legally wrong if—because the two commodities are obviously not alike—he has not the means to achieve his purpose. Thus in Kann v. Diamond Steel Co., 8 Cir., 89 F. 706, 712, Judge Sanborn said: "A considerable part of the evidence and argument for the appellant was devoted to establishing the fact that Robert J. Marx and the appellees adopted and used the word 'Diamond' and the picture of a radiant diamond with the intention of deceiving purchasers and di-

---

9 As we said (per Judge L. Hand) in L. E. Waterman Co. v. Gordon, 2 Cir., 72 F.2d 272, 273: "It would be hard, for example, for the seller of a steam shovel, to find ground for complaint in the use of his trade-mark on a lipstick."

10 See National Fruit Products Co. v. Dwinell-Wright Co., 47 F.Supp. 499, 508 (see also pages 505, 506), affirmed 1 Cir., 140 F.2d 618. Judge Wyzanski cites R. C. A. Mfg. Co. v. Whiteman, 2 Cir., 114 F.2d 86, 90. Cf. Triangle Publications v. New England Newspaper Pub. Co., D.C., 46 F.Supp. 198, 203; Callman, Unfair Competition and Trade-Marks, § 62.2(a).

verting the business of the appellant. The conclusion we have reached renders it unnecessary to consider this evidence. If Robert J. Marx and the appellees ever had such a purpose, they never used any means calculated to accomplish it, and they adopted those admirably suited to defeat it. Their intention, therefore, becomes immaterial. A wrong done or threatened, and consequent injury or probable injury to the complainant, are indispensable elements of every cause of action. The intention to injure another, if no injury is done, and none ever will be done, constitutes no ground for relief. The intention on the part of the alleged infringer to induce purchasers, through the use of a simulated trade-mark, to buy his goods under the belief that they are another's furnishes no ground for relief, unless the similarity between the two trade-marks is of a character 'to convey a false impression to the public mind, * * * and to mislead and deceive the ordinary purchaser.' McLean v. Fleming, 96 U.S. 254, 256 [24 L. Ed. 828]; N. K. Fairbank Co. v. R. W. Bell Mfg. Co., 77 F. 869, 876, 23 C.C.A. 554. The reason for this rule is that neither actual nor probable 'injury,' in the legal sense of that word, results from the use of a trade-mark that is not calculated to mislead the public, or to deceive the purchaser, and hence one of the indispensable elements of a good cause of action is wanting. Whatever may have been the intention of Robert J. Marx and the appellees in adopting and using their trade-mark, it does not sufficiently resemble that of the appellant to mislead purchasers, or to convey a false impression to the public. There is no evidence in the record that the appellant has ever suffered any injury from any deception caused by it, and there is no probability that it ever will. Such a case presents no ground for relief, either at law or in equity." See also N. K. Fairbank Co. v. R. W. Bell Mfg. Co., 2 Cir., 77 F. 869, 876; Allen B. Wrisley Co. v. Iowa Soap Co., 8 Cir., 122 F. 796, 797; United States Tobacco Co. v. McGreenery, C.C., 144 F. 531, 534; cf. Gort Girls Frocks, Inc. v. Princess Pat Lingerie, D. C., 73 F.Supp. 364.

These decisions are in accord with the doctrine that, ordinarily, an intention, no matter how evil, to harm another is a damp squib if the means for effectuating it are completely wanting. So if Jones, intending to defame Smith, publishes a written statement that Smith is a "staunch Republican," Jones' futile intention does not render that publication actionable.

5. I think that my colleagues' discussion of Vogue Co. v. Thompson-Hudson Co., 6 Cir., 300 F. 509, misses the point. There the plaintiff, publisher of the magazine "Vogue," had for many years devoted much effort to promoting styles in women's hats. Twenty years after the first publication of that magazine, the defendants began to sell such hats under the name "Vogue." Arguing just as plaintiff does here, plaintiff sought an injunction against that conduct. It was denied by the Sixth Circuit, on reasoning fundamentally at variance with my colleagues'. On rehearing, Vogue Co. v. Vogue Hat Co., 6 F.2d 875, the Sixth Circuit reversed itself—but solely because, in addition to making use of the name "Vogue," the defendant had also coupled it with a distinctive symbol "V," combined with a picture of a woman, which combined symbol plaintiff had registered and widely exploited. As to the use by defendant merely of the name Vogue, the Court said, 300 F. at page 511: "So far as plaintiff's rights are based upon the mere use of the word 'Vogue' in the phrase 'Vogue Hats,' we think the District Court was right. The word itself was by no means arbitrary. In 1892, as since, the word was one of common right. It was approximately synonymous with 'style' or 'fashion.' If it had been during a long period exclusively applied by a manufacturer to its product, a forceful secondary meaning might or might not have arisen; but it has not been so applied. In so far as it went beyond merely indicating the magazine, it has been constantly used in substantially a descriptive way, and in that way there would not be, nor has there been, any exclusive use by plaintiff."

It is of interest that, in the case at bar, the trial judge held the Vogue case in-

apposite.[11] He should have gone further and said that it was basically inconsistent with his own decision; for, had there been nothing but the use of the name Vogue, the Sixth Circuit would have refused an injunction. The Vogue case, I think, should persuade the Supreme Court to grant certiorari here, because of a conflict between circuits.

6. Question has been raised as to whether the trade-name doctrine, by its creation of "perpetual monopolies,"[12] has not injured consumers,[13] a question of peculiarly serious import in these days

[11] For like reasons he held similarly as to another case cited by my colleagues, Esquire, Inc. v. Esquire Bar, D.C., 37 F. Supp. 875.

[12] See Shredded Wheat Co. v. Humphrey Cornell Co., 2 Cir., 250 F. 960, 964.

[13] See, e.g., Zlinkoff, Monopoly v. Competition, 53 Yale L.J. (1944) 514; Ladas, Trade-Marks and Names, 15 Encyc. of Soc. Sciences, 57, 59; Cohen, Transcendental Nonsense and The Functional Approach, 35 Col.L.Rev. (1935) 809, 817; Committee on Recent Soc. Trends, II, 875; Lyon, Watkins & Abramson, Government and Econ. Life (1939) I, 229-233; Standard Brands v. Smidler, 2 Cir., 151 F.2d 34 at page 38ff; Eastern Wine Corp. v. Winslow-Warren, Ltd., 2 Cir., 137 F.2d 955; cf. Kellogg v. National Biscuit Co., 305 U.S. 111, 122, 59 S.Ct. 109, 83 L.Ed. 73.

The trade-name doctrine, this court has said per Judge Learned Hand, enables one to acquire a vested interest in a demand "spuriously" stimulated through "the art of advertising" by "the power of reiterated suggestion" which creates stubborn habits. See Shredded Wheat Co. v. Humphrey Cornell Co., 2 Cir., 250 F. 960, 962, 963. This poses an important policy question: Should the courts actively lend their aid to the making of profits derived from the building of such habits, if and whenever those stubborn habits so dominate buyers that they pay more for a product than for an equally good competing product? In Eastern Wine Corp. v. Winslow-Warren, Ltd., 2 Cir., 137 F.2d 955, 957, 959, we said: "On oral argument, plaintiff's counsel contended that the alleged confusion resulting from the alleged similarity of the names was injurious to consumers. That contention embodies a frequently encountered misunderstanding of the doctrine of 'unfair competition,' a misunderstanding which has led to those instances of undue extension of the doctrine on which plaintiff relies. Much of that misunderstanding seems to stem from the misleading use of the word 'competition' in the label 'unfair competition.' For, while completion has been cherished in part on the ground that it fosters character traits in competing businessmen deemed socially valuable, its basic virtue is generally regarded as consisting of its benefits to consumers. The magna carta of competition, Adam Smith's The Wealth of Nations, made it clear that the consumer's interests were to be the dominant aim of the competitive system: 'Consumption,' wrote Adam Smith, 'is the sole end and purpose of all production; and the interest of the producer ought to be attended to, only so far as it may be necessary for promoting that of the consumer. The maxim is so perfectly self-evident that it would be absurd to attempt to prove it.' But the legal protection of trade-names does not engender competition; on the contrary, it creates lawful monopolies, immunities from competition. And the legally forbidden invasions of those monopolies might often benefit consumers. Thus, if a competitor of the manufacturer of a toothpaste with an established trade-name were to sell that identical toothpaste under that name but at half the usual price, the consuming public would be better off financially; nevertheless such competition would, of course, be enjoined. * * * The failure to keep constantly in mind the divers policy considerations which, in this legal province, come in conflict with one another and the consequent occasional overemphasis on but one of them—the protection of the interest of the businessman who has built a business around a name—has sometimes led to decisions unduly extending the confines of name-monopolies."

See Standard Brands v. Smidler, 2 Cir., 151 F.2d 34, 40, 41, concurring opinion: "If Alert & Co. sells a laundry soap, under the name 'Quick Clean,' at 75¢ a cake, and a competitor, Wiseacre, Inc., then begins to sell the identical soap under the same name at 50¢ a cake, Alert & Co. loses customers, and therefore money, if it maintains its price; but the purchasers are misled to their financial benefit. If the sole purpose were to protect consumers from direct financial loss, the second name-user in such a case would have a complete defense if he showed that he sold, at a lower price, precisely the same article (compounded of exactly the same ingredients) as the first user. There are other reasons assigned for judicially safeguarding trade-

when living-costs are notoriously oppres-sive. Since, however, the Supreme Court has approved the doctrine, an intermediate court (such as ours) must enforce it.[14] But, in the absence of legislation so re-quiring, we should not expand it.[15]

That my colleagues do so here is the more surprising, since of recent years this court has been markedly cautious about sustaining an injunction in a case where a defendant uses a trade-name iden-tical with plaintiff's but in an "appendant market" which plaintiff has not yet enter-ed.[16] And, just the other day, in with-holding relief, we said that a plaintiff must make out an unusually strong case when his trade-name relates to a business and not to any particular product. Best & Co., Inc. v. Miller, 2 Cir., 167 F.2d 374. I think that anyone reading the decision in the Best case and the decision here will be in considerable confusion about the doc-trine of confusion in this circuit. On that ground, also, it seems to me the Supreme Court should review this decision.

7. All else aside, *plaintiff has failed to show that it has sustained, or is likely to sustain, any actionable loss.* This appears from the following:

(1) In cases where a defendant has used the name only in an "appendant" field which plaintiff has not entered, we have held that "the owner's only interest in pre-venting * * * use of his mark is be-cause he may wish to preempt the market for later exploitation, or not to expose

his reputation to the hazard of the new-comer's business practices, or both."[17]

(2) As I have said, the Triangle Pub-lications does not suggest that it intends ever to make girdles or to do anything ex-cept to publish a magazine. Its complaint, therefore, must rest solely on the second ground, i. e., that its good reputation may be damaged by defendants' conduct.

(3) But the record contains no evidence indicating that defendants' goods are of a quality inferior to those advertised in plaintiff's magazine. Indeed, plaintiff has set no standards whatever for the products which it claims to "sponsor": The trial judge expressly found that "plaintiff does not, before accepting advertisements to be carried in the magazine, assure itself of the quality of the advertiser's products." (Apparently, the only standard is a per-son's willingness and ability to pay for an advertisement.) Thus the record shows positively that there is no likelihood that defendants' use of the name "Seventeen" will impair plaintiff's reputation.

8. Since the present-day rationale of trade-name protection is such actual or probable confusion of source as to injure or threaten injury to plaintiff's good-will, then, logically, a plaintiff seeking such pro-tection should always be required to prove that defendant's product is so substand-ard that, if that product be associated by consumers with plaintiff, impairment of plaintiff's good-will is a likely result. As yet, the courts have not imposed such a

---

names. The public interest involved 'is primarily in the preservation of honesty and fair dealing in business and in pro-curing "the security of the fruits of in-dividual enterprise." However, there is also the factor that the possibility of ob-taining such monopolies as a reward for their enterprise may have the effect of inducing businessmen to bring out new products which may indirectly benefit the consuming public.' [If the bringing out of new and useful products is to be considered an important element, then perhaps the plaintiff should in each case be required to show that his product is new and useful.] But the conventional assumption that trade-name protection importantly adds, in direct fashion, to consumers' economic welfare, has not as yet been proved to be true in fact. And

the doubts about its truth have brought this question sharply into focus: Even if these trade-name exceptions to the presumption in favor of competition are of no direct use to consumers, do they serve a sufficiently important social in-terest to justify their existence?"

[14] See my dissenting opinion in General Time Instruments Corp. v. U. S. Time Corp., 2 Cir., 165 F.2d 853, 855.

[15] See, e.g., Judge L. Hand in S. C. Johnson, Inc. v. Johnson, 2 Cir., 116 F.2d 427, 429.

[16] See Dwinell-Wright Co. v. White House Milk Co., 2 Cir., 132 F.2d 822, 825; Durable Toy & Novelty Corp. v. J. Chein & Co., 2 Cir., 133 F.2d 853, 855.

[17] Dwinell-Wright Co. v. White House Milk Co., 2 Cir., 132 F.2d 822, 825.

requirement in the ordinary trade-name cases. But, if the frontiers of the trade-name doctrine are to be enlarged to include an extraordinary case like this, then, at a minimum, such proof should be exacted. As explained above, the proof here is precisely contrary.

9. Without doubt, the judge-made trade-name doctrine or concept fosters monopolies; and, generally speaking, the common-law tradition is inimical to monopolies (although opposition to monopoly when it takes the form of an obsessive monopoly-phobia becomes absurd).[18] Some writers, disturbed by the suggestion that judicially-protected trade-names are monopolies, protest that the judicial protection of trade-names rests on prevention of unfairness between competitors, not on protection of monopoly. But, no matter by what doctrinal path the courts arrive at their results in this field, the judicial restraints of defendants do yield plaintiffs' monopolies. To the practical, social consequences of their decisions, the courts ought not shut their eyes. A concept is what it does. If a legal concept produces a monopoly, the concept, pragmatically, is a concept favoring monopoly. Such a concept should be carefully scrutinized when the courts are asked to widen it, as here, by a decision which will become a precedent with "radiating potencies."[19]

A few years ago there was much talk adverse to legal "conceptualism." Some of the talkers seemingly went so far as to decry all concepts. Others, more sagely, objected to the logical application of the wording of a legal concept unless adequate attention is given to the policy the words are designed to express. Long before (in 1891) Holmes, J., had said that legal doctrines have often been "generalized into fiction," and that "the whole outline of the law is the resultant of a conflict at every point between logic and good sense—the one striving to work fiction out to consistent results, the other restraining and at last overcoming that effort when the results became too manifestly unjust."[20] In the light of subsequent criticism of such employment of the term "logic"[21] it is perhaps well to rephrase Holmes' remark thus: Judges should peer behind the mere verbal articulation of a legal rule or concept to observe the policy it embodies, whenever a logical application of that rule or concept, as previously articulated, will yield socially disvaluable results. Such caution becomes especially important when an "analogical extension" of earlier elliptical judicial statements is proposed.[22]

I think that Holmes' admonition was not sufficiently heeded by the trial judge who, although (as already noted) he confessed in his opinion to "some misgivings as to any public benefit from the development of such advertising media as the plaintiff's magazine," nevertheless felt constrained by what he considered the accepted doctrine to grant relief here, regardless of the fact that he recognized that he was going "the furthest the courts have yet been asked to extend the reach" of that doctrine. I think my colleagues err in approving such a decision.

On Petition for Rehearing.

PER CURIAM.

Petition for rehearing denied.

FRANK, Circuit Judge (dissenting).

In their petition for rehearing, defendants refer as to Ex Parte Miss Foundation Co., 76 U.S.P.Q. 616, decided by the Patent Office on March 16, 1948, after we had heard oral argument on this appeal, and therefore not before us when this case was decided. The Patent Office there denies defendants the right to register "Miss Seventeen," under the Trade Mark Act of 1905, as a trademark for their wares, on the ground that "Seventeen" is merely descriptive of "the age group of seventeen." Yet, almost simultaneously, this court sustains a judgment enjoining defendants from using

---

[18] See Eastern Wine Corp. v. Winslow-Warren, Ltd., 2 Cir., 137 F.2d 955, 958-959; Standard Brands v. Smidler, 2 Cir., 151 F.2d 34, 42.

[19] See Hawks v. Hamill, 288 U.S. 52, 58, 53 S.Ct. 240, 77 L.Ed. 610.

[20] Holmes, Agency, 4 Harv.Law Rev.

(1891) 345, reprinted in Holmes, Collected Legal Papers (1921) 49.

[21] Cf. Hoernlé, Book Review, 31 Harv. Law Rev. (1918) 807.

[22] See United Shipyards v. Hoey, 2 Cir., 131 F.2d 525, 526, 527.

"Seventeen," on the ground that it is not descriptive, and does so in the face of uncontradicted evidence in this record which is wholly in line with the conclusion of the Patent Office.

Pointing up what I said as to the confusion concerning the doctrine of confusion in this circuit which will result from the decision in the case at bar, defendants, in their rehearing petition, direct attention to the following: In Lucien Lelong v. Landers Co., Inc., 2 Cir., 164 F.2d 395, 397, this court said, but a few months ago, that it was significant "that the plaintiff did not produce any buyer who had been misled." In Best & Company, Inc. v. Miller, 2 Cir., 167 F.2d 374, decided twelve days before the decision in the instant case, this court underscored the fact that "the record was bare of a single instance of a purchaser buying the defendant's merchandise in the belief that it was the plaintiff's." Having in mind that here, too, the record is bare of a single instance of a misled buyer, I agree with this statement made by defendants in their petition: "If Best & Company, after using Liliputian Bazaar for more than six decades could *not* enjoin a competitor using substantially the same name in the *same* business, it is difficult to understand how plaintiff here, after using Seventeen for less than six months *can* enjoin a *non*-competitor using substantially the same name in a wholly *unrelated* business."